IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 4:06-CV-10116-KMM

RONALD TASSINARI, an individual,
and SHEILA SILVA, individually and as
next best friend of ASHLEY SILVA, a minor,

    Plaintiffs,
vs.

KEY WEST WATER TOURS, L.C.,
a Florida Corporation,

    Defendant.
_____/

KEY WEST WATER TOURS, L.C.,
a Florida Corporation,

    Third-Party Plaintiff/Defendant,
vs.

JEFFREY WILKERSON,

    Third-Party Defendant.
_____/

## DEFENDANT, KEY WEST WATER TOURS, LC'S, MOTION FOR SUMMARY JUDGMENT AND INCORPORATED STATEMENT OF MATERIAL FACTS AND MEMORANDUM OF LAW

    Defendant, KEY WEST WATER TOURS, LC ("Water Tours") files this Motion for Summary Judgment, and in support thereof states as follows:

    1.    This is a personal injury action in which it is alleged that the Defendant rented a personal watercraft to Third-Party Defendant Jeffrey Wilkerson who operated it so as to collide with a personal watercraft rented to Plaintiffs RONALD TASSINARI and ASHLEY SILVA, causing them injury. Complaint at ¶¶ 4, 7 (D.E. 1).

2.     The Complaint contains four counts, which allege the following claims: (I) negligence; (II) breach of statutory duties under Florida law; (III) vicarious liability; and (IV) negligent infliction of emotional distress.

3.     Count I alleges that Water Tours was negligent in three respects, which resulted in injuries to Plaintiffs Ronald Tassinari and Ashley Silva: (1) it failed to give water craft renters sufficient warnings or information pertaining to the safe operation of the vessels; (2) it failed to sufficiently instruct and/or supervise members of the tour; and (3) it failed to provide adequate assistance and first aid, thereby aggravating Plaintiffs' injuries.

4.     Count II alleges that Water Tours violated Florida Statutes §§ 327.39(6)(b), 327.54(1)(e), and 327.54(4)(b), "in that Defendant owed Plaintiffs, as renters of watercraft from Defendant, the duty to provide training, instruction, supervision, and guidance in the safe operation of personal water craft, and supervision to all renters . . . ." See (D.E. 10)(Joint Scheduling Report at ¶ (C)(ii)). Additionally, Plaintiffs have alleged that Water Tours violated Florida Statutes § 327.54(5) by failing to obtain insurance to cover accidents involving personal watercraft. See Complaint at ¶ 17 (D.E. 1).

5.     Count III is a claim for Water Tours' alleged vicarious liability.

6.     Count IV is a claim for the negligent infliction of emotional distress by Plaintiff Sheila Silva, which claim was dismissed after this Court granted Defendant's Motion for Judgment on the Pleadings. (D.E. 32).

7.     The pleadings and depositions filed in support of this Motion for Summary Judgment show there is no genuine issue as to any material fact and that Water Tours is entitled to Final Summary Judgment as a matter of law, for the following reasons:

    (a).   Water Tours is entitled to exoneration from liability as there is no evidence of negligence or unseaworthiness under 46 U.S.C. § 30505.

(b). Alternatively, Water Tours is entitled to have its liability limited as it was without privity or knowledge of any alleged negligence or unseaworthiness under 46 U.S.C. § 30505.

(c). Water Tours is entitled to summary judgment as to Count II because this is a maritime action, which is not governed by Florida Statutory law.

(d). Water Tours is entitled to summary judgment as to Plaintiff Ronald Tassinari's claims based on the hold harmless provisions found in the rental agreement.

## STATEMENT OF MATERIAL FACTS

8. On July 9, 2004, several people, including the Plaintiffs and Third-Party Defendant Jeffrey Wilkerson ("Wilkerson"), rented personal watercraft from Defendant Key West Water Tours, L.C. ("Water Tours"). Complaint at ¶ 4 (D.E. 1).

9. Plaintiffs Ronald Tassinari and Ashley Silva, a minor, were operating one watercraft, and Plaintiff Sheila Silva was operating another watercraft. Id. at ¶¶ 4, 37. At the time of the subject incident, Plaintiff Ronald Tassinari was dating Sheila Silva. Additionally, Ashley Silva is Sheila's daughter. Id. at ¶ 34; Depo. of Ronald Tassinari at 38 (D.E. 25, Exhibit "1").

10. Jeremy Ray and Gerald Grogan own Water Tours. Depo. of Jeremy Ray at 6, Exhibit "1."

11. The renters were also enrolled to participate in a two-hour aquatic tour of Key West, Florida. Depo. of Chris Betz at pp. 22-23, (D.E. 37, Exhibit "1"). Prior to boarding the personal watercraft, every renter was required to sign a rental agreement, which expressly provided that they assumed all risks in connection with the tour, and agreed to indemnify and

hold Water Tours harmless for any loss, damage, or personal injuries sustained during the tour.[1]

12.     Specifically, each one-page rental agreement contained, in pertinent part, the following provisions:

> CHARTERER agrees to hold harmless and indemnify OWNER against all damages, loss costs, fees and liability of any kind no matter how arising or occasioned, whether to property, boats of to persons including OWNER and / or arising out of OWNER'S use of equipment and irrespective of contributory negligence of any other persons.
>
> . . .
>
> **WAIVER**
> I understand that Jet Ski watercraft and Yamaha Water Vehicles are recreational vehicles which must be used with caution and care. Operators are warned to pay strict attention to instructions provided to them by the renter and to operate this watercraft in a safe manner. Passengers, if any, are advised to avoid distracting or diverting the attention of the operator while the vehicle is in motion. Furthermore, it must be recognized by both parties that in operating or riding on any Jet Ski type recreational vehicle that they are assuming a certain degree of risk which may result in injury.

Rental Agreements, attached as Exhibits "2" & "3."

13.     After executing the rental agreement, the renters were directed to the dock, where the group was given instructions on how to safely operate the personal watercrafts. On this particular occasion, tour guide Chris Betz gave the pre-ride safety instructions. Depo. of Chris Betz at 21 (D.E. 37, Exhibit "1").

14.     Mr. Betz was an experienced tour guide who had previously led between 30 to 40 tours and had also previously worked for another Jetski rental business in Key West. Id. at 10, 21. Mr. Betz had watched a video of a senior tour guide; personally observed pre-ride speeches by senior tour guides; shadowed senior tour guides on at least three tours; and was personally observed and critiqued by other tour guides for at least three to four days. Id. at 13-15.

---

[1] The provisions of the rental agreement do not apply to Plaintiff Ashley Silva because she did not sign a rental agreement, nor did anyone sign one on her behalf.

15. At his deposition, Chris Betz explained the safety measures that were addressed during his pre-ride speech:

> A. The speech covers any and all safety that you need to tell the renter or the people renting the Jetskis.
> What it is, is we cover everything from the lanyards, how to unclip them from your life vest, how to clip them to the machine, where the fire extinguishers are, the storage units, how to get in and out of those, if you fall off, how to get back onto those, what to do when you see certain hand signals that I'm going to be using.
> I cover all my hand signals, what I would like them to do when they see the hand signals, how I would like them to react to the hand signals.
> I let them know, I give them a visual distance of how far I want them to stay away from each other, and I actually get down onto the dock and I go to each Jetski and I show them how to start and how to shut off the engines. I show them another button called the bilge pump, what it's used for, answer any questions that they have during this whole entire speech
> The very first thing I ask them to do is sit and be quiet and pay attention and that is what I need them to do. I ask them to scan right and left, left to right, always looking for the waterways.
> I ask them to always heed the right of way to any other boat, watercraft, anything that's on the water because they are part of a tour, part of the rental group, so give the right of way to everyone, ask them to stop if they think there's any chance that they're going to hit someone. If someone is coming in their path, I tell them it's the most important thing to always scan, always watch. In case someone else isn't paying attention, at least you will be.
> I also let them know exactly what we're going to be doing as soon as they get in the water so there's no surprises, so they know exactly where we're going to go to our first stop. They know my hand signal and it means stop. They know when to shut their engines off. Like I said, I ask them to ask me any questions, and questions are asked and I always answer them, so.

Id. at 16-17.

. . .

> Q. Okay. Is that part of your speech, that you tell people, "Don't jump waves, don't jump wakes, it's dangerous?"
> A. Correct.
> Q. Does your speech include anything about steering Waverunners?
> A. Yes.
> Q. Tell me what specifically you say about steering.
> A. "Steering is jet propelled with the Jetskis. It's not like a car. You don't have your hand on the gas. If your're not using the throttle, you're not going to go anywhere. If you want to turn right, you have to turn right

>    and you have to give it gas. If you want to turn left, you have to give it gas and turn left."
>
> Id. at 32-33 (D.E. 37, Exhibit "2").
>
>    . . .
>
>    Q. I have just a couple quick questions. During the safety lesson that you gave to the people at issue here, do you point out the distance that they should make sure, begin slowing down before they get to another personal watercraft?
>    A. I don't point, no, I don't point out the distance they should start slowing down. I point out the distance that they need to stay away from each other, either from a parallel or a lateral distance.
>    Q. And what is that distance that you show them?
>    A. We want to keep them at least, at least 300 feet or more apart from each other.
>    Q. Do you demonstrate to them what 300 feet is?
>    A. That's correct. We give them a visual.
>    Q. And what is that visual that you give them?
>    A. When we're sitting on the dock, there's a channel. Across the channel, there's a trailer park. There's several items over there that are sitting very close to 300 feet, and we tell them to turn around, look at it, spot it, ask them if they see it. They say "yes".
>    We say, "From here, like from where you're at to there is exactly where you need to be staying apart from each other."
>
> Id. at 47-48.
>
>    . . .
>
>    Q. And do you tell them that they should not get any closer than that to the other personal watercraft when they're full throttle, so to speak?
>    A. We tell them that we never want them to get any closer than that to any watercraft that's right there, to any boat anything that's on the water unless we ask them to.
>
> Id. at 49.

16.     In addition to these pre-ride instructions, Water Tours also had signage posted at the rental facility, which outlined additional guidelines for the safe operation of a personal watercraft. Id. at 18-19 (D.E. 37, Exhibit "1"). Shortly after the pre-ride instructions, Mr. Betz and the group embarked on the tour.

17.     As a part of the tour, the group visited various locations around the island of Key West. Id. at 22-23. Periodically, the group would stop and the renters were given free time to operate their personal watercraft. Id. at 23, 28 (D.E. 37, Exhibits "1" & "2"). After being on the

water for over an hour, the group stopped for its second free time session. <u>Id.</u> at 23-25 (D.E. 37, Exhibit "1").

18. At the end of this session, Mr. Betz began to gather the renters by giving them a hand signal so that the group could continue the tour. <u>Id.</u> at 26 (D.E. 37, Exhibit "2").

19. After the majority of the group had been rounded up, Mr. Betz went out to tell Jeffrey Wilkerson and another man that they needed to come in and rejoin the group. <u>Id.</u> at 26-27. Mr. Betz then returned to the group and began to watch Mr. Wilkerson as he approached. <u>Id.</u>

20. According to Mr. Betz, Mr. Wilkerson

> was coming in way too fast, way too fast, and right at the group. And it's just like an old lady in a car, panicked, eyes wide open, completely wide open, staring straight at the group and a panic in his face because he's going too fast, and never let off the throttle until he hit.

<u>Id.</u>

21. Jeffrey Wilkerson essentially drove his watercraft into the side of the watercraft that was occupied by Plaintiffs Ronald Tassinari and Ashley Silva. <u>Complaint</u> at ¶ 7 (D.E. 1).

22. Up until the accident, Mr. Betz had not observed anyone, including Mr. Wilkerson, operating a wave runner in an unsafe manner. <u>Depo. of Chris Betz</u> at 23, 28 (D.E. 37, Exhibits "1" & "2"). Additionally, no one had complained about having any difficulty operating the machines. <u>Id.</u> at 31 (D.E. 37, Exhibit "2").

23. After the accident, Mr. Betz immediately jumped off of his watercraft and into the water to assist the Plaintiff Ronald Tassinari and Ashley Silva. <u>Id.</u> at 34. Mr. Betz first attended to Plaintiff Ashley Silva.

> She was the first one. I asked her several questions. "What hurts," was the first question, and she kept saying her face. I said, "Anything else not your face? Does your head hurt? Does your neck hurt? Does your back hurt? Can you feel your legs? Can you feel your arms? Does your chest hurt?"

> I asked her several questions making sure that she wasn't extremely injured, you know, back injury, head injury, because I didn't want to move her if anything like that was happening.
>
> . . .
>
> So I got ahold of her. I swam her back to my Jetski. I picked her up and put her on my Jetski.

Id. at 34-35.

24. After he put Ashley Silva onto his watercraft, Mr. Betz proceeded to attend to Mr. Tassinari and Mr. Wilkerson in a similar manner. Id. Once everyone was back on the watercraft, Mr. Betz called the rental office on a cell phone, notified them of the accident, and proceeded to take the group back to shore. Id. at 36.

> Q. Okay. So once you got them to shore, what did you do?
> A. I had asked them whether they wanted, you know, "Do you want me to call an ambulance to take you to the hospital?" I said, "Do you want an ambulance? How do you want to get there?" You know, and the cab came up, a taxicab came up and came up on the street, a taxi came up. I said, "Do you want to take an ambulance or do you want to take a taxicab?" And they said, "We'll take a taxi."
> Q. So as I understand what you're saying is that you asked them if they wanted you to call 911, essentially?
> A. Yeah.
> Q. Call for an ambulance?
> A. Un-huh.
> Q. And they told you no?
> A. To be honest, I can't tell you their exact words. I don't remember "no" coming up. It was just a question, I asked them what they prefer.

Id. at 38.

25. Later that same day, Plaintiff Ronald Tassinari returned to Water Tours and spoke with Jeremy Ray, who is a co-owner of Water Tours:

> Q. Did you at any time ever speak with Mr. Tassinari or Miss Silva?
> . . .
> A. Yeah, we helped them into the taxicab, and then after we went back to the shop, later Ronald came back to the shop and just basically wanted to say thank you for everybody's help.
> Q. Okay.
> A. I did talk to him then.
> Q. Okay. What did he say to you, or what did you two speak about at that time?

8

> A. Really he just came by to say thank you, and he wanted to tell Jerry and I as the owners of the company that Chris [Betz] had done a good job and he appreciated everybody's help, because we basically stopped the business and everybody went to help him, and he appreciated that.

Depo. of Jeremy Daniel Ray at 17, Exhibit "1."

26.     This was the **first** time Water Tours renters were injured in an accident during the tour. Depo. of Gerald Grogan at 30, Exhibit "4."

## MEMORANDUM OF LAW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. See Fed.R.Civ.P. 56(c). In this case, Water Tours is entitled to Summary Judgment for several reasons:

## I. LIMITATION AND EXONERATION

The standard for exoneration is different from that for limitation. "'An owner will be exonerated from liability when he, his vessel, and crew are found to be completely free of fault.'" Hammersley v. Branigar Org., Inc, 762 F.Supp. 950, 955 (S.D. Ga. 1991)(quoting In re Complaint of Caribbean Sea Transport, 748 F.2d 622, 626 (11th Cir.1984)). Alternatively, "[t]he Limitation Act limits a shipowner's liability for an accident to the value of his vessel if the shipowner had no knowledge of or privity to the negligence or unseaworthiness that caused the accident." Id. at 954. In pertinent part, the Act provides that: "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight." 46 U.S.C. § 30505(a).[2]  Additionally, "[u]nless otherwise excluded by law, claims, debts, and liabilities subject to limitation . . . are those arising from . . .

---

[2] "The Act was originally contained in 46 U.S.C.App. §§ 181-189. In 2006, in order to complete the codification of Title 46, Congress reorganized and restated the laws which formerly appeared in the appendix to that title. Pub.L. No. 109-304, § 2, 120 Stat. 1485 (2006). The Act now appears in chapter 305 of Title 46 at 46 U.S.C. 30501-30512. *See id* § 6, 120 Stat. at 1512." In re Omega Protein, Inc., 2007 WL 803934, n.1 (W.D. La. 2007).

9

any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner." Id. at § 30505(b). The Eleventh Circuit has held that jet skis are vessels under the Limitation Act. See Keyes Jet Ski, Inc. v. Kays, 893 F.2d 1225, 1227-31 (11th Cir. 1990).

When limitation is pled as an affirmative defense, "'a *defendant* must show how the loss occurred, together with its lack of privity to or knowledge of the asserted cause.'" Hammersley, 762 F.Supp. at 955 (emphasis in original)(*quoting* Terracciano v. McAlinden Constr. Co., 485 F.2d 304 (2d Cir. 1973)). Although not expressly defined by the Act, "privity or knowledge" is generally defined as the vessel owner's personal participation in, or actual constructive knowledge of, the specific acts of negligence or unseaworthiness, which cause the subject accident or injuries. Hammersley, 762 F.Supp. at 955. In the case of a corporate owner, such as the instant case,[3] the individual charged with privity or knowledge must be sufficiently high in the corporate hierarchy for the individual's knowledge to be imputed to the corporation. See Terracciano v. McAlinden Constr. Co., 485 F.2d 304 (2d Cir. 1973). Accordingly, either Jeremy Ray or Gerald Grogan would have to be found to have the requisite "privity or knowledge" for it to operate as a bar to limitation.

### A.   *WATER TOURS IS ENTITLED TO EXONERATION FROM LIABILITY*

Water Tours is completely without fault. Plaintiffs allege that Water Tours negligently failed to give watercraft renters sufficient warnings or information pertaining to the safe operation of the vessels; failed to sufficiently instruct and/or supervise members of the tour; and failed to provide adequate assistance and first aid, thereby aggravating Plaintiffs' injuries. Complaint at ¶¶ 10-12 (D.E. 1); see also (D.E. 10, Joint Scheduling Report at ¶ (A)).

---

[3] The watercraft that was operated by Jeffrey Wilkerson at the time of the accident was owned by Water Tours. Depo. of Gerald Grogan at 33, Exhibit "4."

The sole cause of the subject accident was the negligent operation of a personal watercraft by Third-Party Defendant Jeffrey Wilkerson. With regard to the sufficiency of Water Tours' pre-ride instructions, it is telling that Plaintiff Ronald Tassinari actually remembered portions of the instructions **over two years after the fact**, at his deposition. See Depo. of Ronald Tassinari at pp. 83-84, 102 (recalling the start up instructions and the instructions on minimum distance to maintain); and 87 (recalling the tour guide's hand signals)(D.E. 25, Exhibit "1"). The subject accident occurred towards the end of a two-hour tour; accordingly, each member of the tour had become well acquainted with the operational characteristics of the watercraft. Id. at 88; see also Depo. of Chris Betz at pp. 22-23, (D.E. 37, Exhibit "1"). Given the entire context of the instant case, the sufficiency of pre-ride instructions had absolutely no bearing on the subject accident. There is not a single additional instruction that would have prevented the subject accident; especially given the fact that Wilkerson had been operating the watercraft for nearly two hours prior to the subject accident.

Additionally, there is no evidence that Mr. Betz failed to properly supervise the group. On the contrary, Mr. Betz was doing exactly that when he had all of the renters gather around. The fact that Wilkerson may have done so in a negligent manner is not evidence of active fault by Water Tours itself.

There is also no record evidence that Water Tours failed to adequately provide assistance and first aid as alleged in the Complaint. See Complaint at ¶ 12 (D.E 1). The tour guide immediately provided assistance to the Plaintiffs in the water; he quickly got them to shore; and he called them a cab, as they requested. Deposition of Chris Betz at pp. 34-38, (D.E. 37, Exhibit "2"). In fact, Mr. Tassinari later returned to Water Tours to tell the owners what a good job Mr. Betz had done. Depo. of Jeremy Daniel Ray at 17, Exhibit "1."

Water Tours is completely without fault as to the Plaintiffs' accident and is therefore entitled to exoneration from liability.

### B.     ALTERNATIVELY, WATER TOURS IS ENTITLED TO HAVE ITS LIABILITY LIMITED

"The determination of whether a shipowner is entitled to limitation employs a two-step process.  First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident.  Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." Farrell Lines, Inc. v. Jones, 530 F.2d 7 (5th Cir. 1976).

In the instant case, Water Tours had an absolutely perfect history with no prior incidents involving its personal watercraft.  See Depo. of Gerald Grogan at 30, Exhibit "4."  Additionally, there are no allegations or evidence that there were any mechanical problems with the subject watercraft and all safety instructions were properly given by tour guide Chris Betz.  See Depo. of Chris Betz, at 16-17., 32-33, 47-49, (D.E. 37, Exhibits "1" & "2").

Third-Party Defendant Jeffrey Wilkerson's watercraft struck the Plaintiffs in an unexpected accidental collision.  Water Tours was completely without privity or knowledge of any risk-creating condition.  Co-owners Jeremy Ray and Gerald Grogan did not play any roll in the pre-ride instructions or the tour; therefore, Water Tours cannot be attributed with the requisite privity or knowledge of any alleged negligence occurring during that same time period.  Absent any record evidence of privity or knowledge of a risk-creating condition on the part of either Mr. Ray or Mr. Grogan, Water Tours is entitled to have its liability limited to the value of the vessel, which is $3,000.00. See Affidavit of Jeremy Ray at ¶ 6, Exhibit "5."

### II. FLORIDA STATUTORY LAW IS INAPPLICABLE TO THIS ACTION

Plaintiffs claim that Water Tours violated Florida Statutes §§ 327.39(6)(b), 327.54(1)(e),

12

and 327.54(4)(b), by failing "to provide training, instruction, supervision, and guidance in the safe operation of personal water craft, and supervision to all renters . . . ." See (D.E. 10, Joint Scheduling Report at ¶ (C)(ii)). Additionally, Plaintiffs have alleged that Water Tours violated Florida Statutes § 327.54(5) by failing to obtain insurance to cover accidents involving personal watercraft. See Complaint at ¶ 17 (D.E. 1). Plaintiffs' reliance on Florida Statutory law is misplaced. In In re: The Complaint of Royal Caribbean Cruises Ltd., 459 F.Supp.2d 1284, n.2 (S.D. Fla. 2006), the Court wrote: "this action is a maritime personal injury action and as such is governed by substantive general maritime law. ... Therefore, the Court will not address the merits of Claimants' arguments regarding alleged violations of Florida statutory law."[4] See also n.3 ("In his brief, Claimant appears to argue that the [Royal Caribbean] Wave Runner was not operated in accordance with Florida statutes. However, this action is brought under federal maritime law. Therefore, [Royal Caribbean's] alleged failure to comply with a Florida statute in the operation of its Wave Runner tour is inapplicable."); see also In re: The Complaint of Royal Caribbean Cruises Ltd., 459 F.Supp.2d 1275, 1284 (S.D. Fla. 2006). Therefore, Summary Judgment as to Count II is proper.

### III. PLAINTIFF RONALD TASSINARI'S CLAIMS ARE BARRED BY THE RENTAL AGREEMENT

In the Rental Agreement, attached as Exhibit A, Plaintiff Ronald Tassinari agreed

> to hold harmless and indemnify OWNER [Water Tours] against all damages, loss costs, fees and liability of any kind no matter how arising or occasioned, whether to property, boats of to persons including OWNER and / or arising out of OWNER'S use of equipment and irrespective of contributory negligence of any other persons.

---

[4] Although the Court's opinion in In re: The Complaint of Royal Caribbean Cruises Ltd., 459 F.Supp.2d 1284 (S.D. Fla. 2006) does not identify the specific statute that the Claimants were relying upon, a review of the Claimant's brief (D.E. 71 of case # 1:04-cv-201550) shows that it was Florida Statutes § 327.39(6)(b). This is also one of the statutes relied upon by the Plaintiffs in the instant case. See Complaint at Count II (D.E. 1).

Rental Agreement, attached as Exhibit "2."

In addition to this language, the rental agreement also contained the following provisions

**WAIVER**
I understand that Jet Ski watercraft and Yamaha Water Vehicles are recreational vehicles which must be used with caution and care. Operators are warned to pay strict attention to instructions provided to them by the renter and to operate this watercraft in a safe manner. Passengers, if any, are advised to avoid distracting or diverting the attention of the operator while the vehicle is in motion. Furthermore, it must be recognized by both parties that in operating or riding on any Jet Ski type recreational vehicle that they are assuming a certain degree of risk which may result in injury.

Id. (emphasis in original).

"[T]o enforce such releases, courts generally require that the contractual language at issue be 'clear and unequivocal and clearly indicate [ ] the intentions of the parties.'" In re the Complaint of Royal Caribbean Cruises LTD., 403 F.Supp.2d 1168 (S.D. Fla. 2005)(Claim for injuries while riding a rented Jetski barred by release; summary judgment granted); see also Waggoner v. Nags Head Water Sports, Inc., 141 F.3d 1162 (unpublished) (4th Cir. 1998).

In the instant case, the language of the rental agreement is clear and unequivocal and expressly identifies the intentions of the parties. Mr. Tassinari unambiguously agreed to indemnify[5] and hold Water Tours harmless "against all damages ... and liability of any kind no matter how arising or occasioned . . . ." Rental Agreement, attached as Exhibit "2" (emphasis added). Further, the agreement expressly contemplates liability arising out of Water Tours' "use of equipment and irrespective of contributory negligence of any other persons." Id.

In addition to this language, the term **WAIVER** is clearly visible in an all capital, bold font and is followed by statements indicating "that in operating or riding on any Jet Ski type recreational

---

[5] The indemnity provision applies to first party claims. See Edward E. Gillen Co. v. U.S., 825 F.2d 1155 (7th Cir. 1987).

14

vehicle that they are assuming a certain degree of risk which may result in injury." Id. Notably, Mr. Tassinari testified that he had ridden personal watercraft prior to the accident and that he was aware of the potential for injury when riding the same. See Depo. of Ronald Tassinari at 80, (D.E. 25, Exhibit "1"). Accordingly, the Plaintiff was fully aware of the potential risks and he consciously chose to waive any right of recovery against Water Tours if those risks were realized.

WHEREFORE, Defendant KEY WEST WATER TOURS, LC, respectfully requests that this Court enter an Order granting it summary judgment based on exoneration and Plaintiff Ronald Tassinari's release. The Defendant also requests an Order granting it summary judgment as to Count II of the Complaint based on the inapplicability of the Florida Statutes. In the alternative, Defendant KEY WEST WATER TOURS, LC, respectfully requests that this Court enter an Order limiting its liability to the value of the vessel. Finally, Water Tours also requests a 30-minute special set hearing for this Motion to be heard by the Court.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof was electronically filed and mailed this 9th day of May, 2007 to: Domingo C. Rodriguez, Esq. and Patricia Leigh McMillan, Esq., Rodriguez, Aronson & Essington, P.A., Attorney for Plaintiffs, 2121 Ponce de Leon Boulevard, Suite 730, Miami, FL 33134; and Jeffrey Wilkerson, 7519 Lone Eagle Drive, Murfreesboro, TN 37128.

COONEY, MATTSON, LANCE, BLACKBURN, RICHARDS & O'CONNOR, P.A.
Attorneys for KEY WEST WATER TOURS, LC
1600 West Commercial Boulevard, Suite 200
Fort Lauderdale, FL 33309
(954) 568-6669

/s/ *Bruce Trybus*
By: _____
BRUCE TRYBUS
Florida Bar No. 972983