IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 4:06-CV-10116-KMM

RONALD TASSINARI, an individual,
and SHEILA SILVA, individually and as
next best friend of ASHLEY SILVA, a minor,

    Plaintiffs,

vs.

KEY WEST WATER TOURS, L.C.,
a Florida Corporation,

    Defendant.
_____/

KEY WEST WATER TOURS, L.C.,
a Florida Corporation,

    Third-Party Plaintiff/Defendant,

vs.

JEFFREY WILKERSON,

    Third-Party Defendant.
_____/

**DEFENDANT, KEY WEST WATER TOURS, LC'S,
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW**

Defendant, KEY WEST WATER TOURS, LC ("Water Tours") files this Response to Plaintiffs' Motion for Summary Judgment, and states as follows:

Although the Plaintiffs' recitation of the facts is generally accurate, certain representations and misimpressions need to be addressed.

Plaintiffs create a misimpression that it was Water Tours' and / or Mr. Betz' decision for the Plaintiffs to take a taxi to the hospital as opposed to an ambulance. Specifically, Plaintiffs write that

"Water Tours had not called 911 to request emergency medical help, and Chris Betz had called for a taxi and not an ambulance." Plaintiffs' Motion for Summary Judgment at ¶ 5. In reality, the Plaintiffs were asked whether they wanted to take a taxi or an ambulance, and they chose to utilize the taxi. In pertinent part, Mr. Betz had the following testimony:

> Q. Okay. So once you got them to shore, what did you do?
> A. I had asked them whether they wanted, you know, "Do you want me to call an ambulance to take you to the hospital?" I said, "Do you want an ambulance? How do you want to get there?" You know, and the cab came up, a taxicab came up and came up on the street, a taxi came up. I said, "Do you want to take an ambulance or do you want to take a taxicab?" And they said, "We'll take a taxi."
> Q. So as I understand what you're saying is that you asked them if they wanted you to call 911, essentially?
> A. Yeah.
> Q. Call for an ambulance?
> A. Un-huh.
> Q. And they told you no?
> A. To be honest, I can't tell you their exact words. I don't remember "no" coming up. It was just a question, I asked them what they prefer.

Depo. of Chris Betz at 38 (D.E. 37, Exhibit "2").

Additionally, Plaintiffs write that "Betz left his employment with Key Cat because the training for renting watercraft was 'intense' and '. . . the owner was a jerk. He was intense. He wanted you to know everything about the Jetski and he wanted you to teach the people there." Plaintiffs' Motion for Summary Judgment at ¶ 7. In fact, Mr. Betz never testified that he left Key Cat because of the "intense" training. In pertinent part, Mr. Betz had the following testimony:

> Q. Why did you leave Key Cat?
> A. To be honest, the boss was a horrible person. I didn't want to work for him.

Depo. of Chris Betz at 13 (D.E. 37, Exhibit "1").
. . .
> Q. When you started working at Key Cat, did you get any training from Key Cat concerning what you're supposed to do with people to whom you are renting Waverunners or personal watercraft before you let them go out on the water?

> A. Yes.
> Q. Okay. Tell me about the training that you had.
> A. The training at Key Cat, it's, it was intense. Actually, like I said, the owner was a jerk. He was intense. He wanted you to know everything about the Jetski and he wanted you to teach the people there. It was just you told every single person about the safety, how it works, how to ride it, what to do. That was just – I don't know what else to say.

Id. at 14.

Clearly, Mr. Betz did not leave Key Cat because of the "intense" training. In fact, record evidence demonstrates just the opposite, as Mr. Betz was employed by Key Cat for approximately eight months. Depo. of Chris Betz at 37 (D.E. 37, Exhibit "2"). If anything, this "intense" training demonstrates that Mr. Betz was well qualified to be a tour guide.

The Plaintiffs also provide the Court with an abbreviated version of Mr. Betz' pre-ride instructions to the renters. See Plaintiffs' Motion for Summary Judgment at ¶¶ 14, 22. The following is a more in depth recitation of those instructions, which were given to all of the renters, including Mr. Wilkerson:

> A. The speech covers any and all safety that you need to tell the renter or the people renting the Jetskis.
> What it is, is we cover everything from the lanyards, how to unclip them from your life vest, how to clip them to the machine, where the fire extinguishers are, the storage units, how to get in and out of those, if you fall off, how to get back onto those, what to do when you see certain hand signals that I'm going to be using.
> I cover all my hand signals, what I would like them to do when they see the hand signals, how I would like them to react to the hand signals.
> I let them know, I give them a visual distance of how far I want them to stay away from each other, and I actually get down onto the dock and I go to each Jetski and I show them how to start and how to shut off the engines. I show them another button called the bilge pump, what it's used for, answer any questions that they have during this whole entire speech
> The very first thing I ask them to do is sit and be quiet and pay attention and that is what I need them to do. I ask them to scan right and left, left to right, always looking for the waterways.
> I ask them to always heed the right of way to any other boat, watercraft,

        anything that's on the water because they are part of a tour, part of the rental group, so give the right of way to everyone, ask them to stop if they think there's any chance that they're going to hit someone. If someone is coming in their path, I tell them it's the most important thing to always scan, always watch. In case someone else isn't paying attention, at least you will be.

        I also let them know exactly what we're going to be doing as soon as they get in the water so there's no surprises, so they know exactly where we're going to go to our first stop. They know my hand signal and it means stop. They know when to shut their engines off. Like I said, I ask them to ask me any questions, and questions are asked and I always answer them, so.

Id. at 16-17.

. . .

  Q. Okay. Is that part of your speech, that you tell people, "Don't jump waves, don't jump wakes, it's dangerous?"
  A. Correct.
  Q. Does your speech include anything about steering Waverunners?
  A. Yes.
  Q. Tell me what specifically you say about steering.
  A. "Steering is jet propelled with the Jetskis. It's not like a car. You don't have your hand on the gas. If your're not using the throttle, you're not going to go anywhere. If you want to turn right, you have to turn right and you have to give it gas. If you want to turn left, you have to give it gas and turn left."

Id. at 32-33 (D.E. 37, Exhibit "2").

. . .

  Q. I have just a couple quick questions. During the safety lesson that you gave to the people at issue here, do you point out the distance that they should make sure, begin slowing down before they get to another personal watercraft?
  A. I don't point, no, I don't point out the distance they should start slowing down. I point out the distance that they need to stay away from each other, either from a parallel or a lateral distance.
  Q. And what is that distance that you show them?
  A. We want to keep them at least, at least 300 feet or more apart from each other.
  Q. Do you demonstrate to them what 300 feet is?
  A. That's correct. We give them a visual.
  Q. And what is that visual that you give them?
  A. When we're sitting on the dock, there's a channel. Across the channel, there's a trailer park. There's several items over there that are sitting very close to 300 feet, and we tell them to turn around, look at it, spot it, ask them if they see it. They say "yes".

      We say, "From here, like from where you're at to there is exactly where you need to be staying apart from each other."

4

Id. at 47-48.

. . .

    Q. And do you tell them that they should not get any closer than that to the other personal watercraft when they're full throttle, so to speak?
    A. We tell them that we never want them to get any closer than that to any watercraft that's right there, to any boat anything that's on the water unless we ask them to.

Id. at 49.

Finally, the Plaintiffs give the false impression that Water Tours spoliated evidence by allegedly disposing of the personal watercraft that was involved in the subject accident. See Plaintiffs' Motion for Summary Judgment at ¶ 21. This is simply untrue. As a preliminary matter, Plaintiffs' initial lawsuit was filed over a year after the subject accident.[1] Up to that point in time, Water Tours did not have any idea of an impending suit. In fact, after the accident, Plaintiff Ronald Tassinari returned to Water Tours and spoke with Jeremy Ray, who is a co-owner of Water Tours, and thanked him for doing such a good job. Depo. of Jeremy Daniel Ray at 17, attached as Exhibit "1" to (D.E. 44). Even after suit was filed, the Plaintiffs neither requested that the watercraft be retained, nor did they request an opportunity to inspect the watercraft. Additionally, there has been absolutely no testimony that the watercraft was unseaworthy. Accordingly, any inability "to test or examine to determine whether seaworthiness was an issue" is only attributable the Plaintiffs' inaction. Plaintiffs' Motion for Summary Judgment at ¶ 21. See Royal & Sunalliance v. Lauderdale Marine Center, 877 So. 2d 843, 844 (Fla. 4th DCA 2004)(Finding no duty to preserve evidence; "A duty to preserve evidence, for purposes of a claim for spoliation of evidence, can arise by contract, by statute, or by a properly served discovery request after a lawsuit has already been filed.")

---

[1] Plaintiffs initially filed suit in Florida state court on September 12, 2005.

**I. THE ALLEGED VIOLATIONS OF FLORIDA STATUTORY LAW DO NOT RENDER WATER TOURS NEGLIGENT PER SE BECAUSE SUCH STATUTES ARE INAPPLICABLE TO THIS MARITIME ACTION.**

Plaintiffs claim that Water Tours violated Florida Statutes sections 327.39(6)(b), 327.54(1)(e), and 327.54(4)(b), by failing "to provide training, instruction, supervision, and guidance in the safe operation of personal water craft, and supervision to all renters . . . ." See (D.E. 10, Joint Scheduling Report at ¶ (C)(ii)). Additionally, Plaintiffs have alleged that Water Tours violated Florida Statutes section 327.54(5) by failing to obtain insurance to cover accidents involving personal watercraft. See Complaint at ¶ 17 (D.E. 1). Plaintiffs' reliance on Florida Statutory law is misplaced.

In In re: The Complaint of Royal Caribbean Cruises Ltd., 459 F.Supp.2d 1284, 1289 n.2 (S.D. Fla. 2006), the Court refused to address "the merits of Claimants' arguments regarding alleged violations of Florida statutory law." See also id. at 1292 n.3 ("In his brief, Claimant appears to argue that the [Royal Caribbean] Wave Runner was not operated in accordance with Florida statutes. However, this action is brought under federal maritime law. Therefore, [Royal Caribbean's] alleged failure to comply with a Florida statute in the operation of its Wave Runner tour is inapplicable."); see also In re: The Complaint of Royal Caribbean Cruises Ltd., 459 F.Supp.2d 1275, 1284 (S.D. Fla. 2006).[2]

The standard under maritime law is "ordinary reasonable care under the circumstances." Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1322 (11th Cir. 1989). By alleging violations of Florida Statutory law, Plaintiffs are attempting to hold Water Tours to a standard more stringent

---

[2] Although the Court's opinion in In re The Complaint of Royal Caribbean Cruises Ltd., 459 F.Supp.2d 1284 (S.D. Fla. 2006) does not identify the specific statute that the Claimants were relying upon, a review of the Claimant's brief (D.E. 71 of case # 1:04-cv-201550) shows that it was Florida Statutes section 327.39(6)(b). This is also one of the statutes relied upon by the Plaintiffs in the instant case. See Complaint at Count II (D.E. 1).

6

than that, which is impermissible. See Branch v. Schumann, 445 F.2d 175, 178 (5th Cir. 1971)("We cannot agree that the Supreme Court in [Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625 (1959)] simply set forth a minimum standard of care which any state, in its discretion, may supplement by imposing a stricter burden on the owner of a vessel in relation to his conduct toward guests. Any such supplementation necessarily entails alteration of an admiralty norm in direct contravention of the quest for uniformity and the Supreme Court's Kermarec mandate that the defendant's conduct be measured by maritime standards."). In Branch, the Court held that the trial judge properly refused to instruct jury that defendant boat owner owed plaintiff the highest degree of care pursuant to Florida statute. Id.

In Miami Valley Broadcasting Corp. v. Lang, 429 So. 2d 1333 (Fla. 4th DCA 1983), the Plaintiff who was injured during a boat race alleged in the ensuing lawsuit that the race organizer had violated Florida Statute section 371.55, which provides that:

> Any person directing the holding of a regatta, tournament or marine parade or exhibition, shall secure a permit from the Coast Guard when such event is held in navigable waters of the United States. A person directing any such affair in any county shall notify the sheriff of the county, the Game and Fresh Water Fish Commission, or the department at least 15 days prior to any event in order that appropriate arrangements for safety and navigation may be assured. Any person or organization sponsoring a regatta or boat race, marine parade, tournament or exhibition shall be responsible for providing adequate protection to the participants, spectators and other users of the water.

Fla.Stat. § 371.55.

In holding that the statute was inapplicable, the court held that "[a]pplying Section 371.55 to this case would make the state law inconsistent with maritime law and place an additional burden upon [the organizer]. A state statute may not be so applied in a case subject to maritime jurisdiction." Miami Valley Broadcasting Corp., 429 So. 2d at 1337; see also Rand v. Hatch, 762

7

So. 2d 1001 (Fla. 3d DCA 2000)(holding that the Plaintiff was not required to comply with the pre-suit requirements of Florida's Medical Malpractice Act where maritime law governed); McDonald v. City of NY, 231 A.D.2d 556 (N.Y. App. Div. 1996)(New York Labor Law imposing strict liability preempted by substantive maritime law); State of Md. Dep't of Natural Res. v. Kellum, 51 F.3d 1220 (4th Cir. 1995)(Maryland statute imposing strict liability for damages to oyster bar preempted by maritime law). The same is true for the instant case, as the Florida Statutes relied upon by Plaintiffs place additional burdens and standards upon Water Tours than the standard of ordinary reasonable care.

Because the Florida Statutes relied upon by the Plaintiffs are inapplicable to the instant case, they cannot be used to establish a claim for negligence per se.

## II. WATER TOURS' ALLEGED VIOLATIONS OF THE FLORIDA STATUTES DO NOT CONSTITUTE NEGLIGENCE PER SE

Because Florida law is inapplicable, as explained hereinabove, Plaintiffs' negligence per se claims are entirely irrelevant.[3] That aside, Plaintiffs are applying the wrong test to support their claim of negligence per se.

Every single Florida decision cited by Plaintiffs was decided before the Florida Supreme Court's decision in Murthy v. N. Sinha Corporation, 644 So. 2d 983 (Fla. 1994), which changed the test for determining whether the violation of a rule or statute constitutes negligence *per se*.

Plaintiffs rely on the old rule that "'[n]egligence per se arises from a violation of any

---

[3] None of the cases decisions cited by the Plaintiffs hold that a state statute can be used to establish negligence per se in a maritime action. Even the Federal decisions cited by Plaintiffs only address violations of various *Federal* laws. See White, 2006 WL 1042548 (S.D. Fla. 2006)(addressing violations of the Americans with Disabilities Act); Knarr, 2000 WL 1886577 (E.D. Pa. 2000)(addressing violations of Coast Guard regulations; although the Plaintiff generically alleged that the Defendant had violated the Florida statutes, these alleged violations were neither specified, nor pursued); Kernan v. American Dredging Co., 355 U.S. 426 (1958)(addressing violations of Coast Guard regulations; and Reyes v. Vantage Steamship Co. Inc, 609 F.2d 140 (5th Cir. 1980)(addressing violations of Coast Guard regulations).

8

statute which establishes a duty to take precautions to protect a particular class of persons from a particular injury or type of injury.'" Plaintiffs' Motion for Summary Judgment at ¶ 31 (D.E. 46)(citing Torres v. Offshore Professional Tour, Inc. 629 So. 2d 192, 193 (Fla. 3d DCA 1993).

In Murthy, the Supreme Court adopted two significant new principles: (1) that "legislative intent, rather than the duty to benefit a class of individuals, should be the primary factor considered by a court in determining whether a cause of action exists when a statute does not expressly provide for one"; and (2) that "[i]n general, a statute that does not purport to establish civil liability but merely makes provision to secure the safety or welfare of the public as an entity, will not be construed as establishing a civil liability." Id. at 985, 986.

The specific issue in Murthy was whether Chapter 489, the licensing and regulatory chapter governing construction contracting, creates a private cause of action. Specifically, homeowners argued that Florida Statutes sections 489.119 and 489.1195 impose a duty on a qualifying agent to supervise his corporation's construction projects, and that a violation of that duty constitutes negligence *per se*. The Supreme Court rejected this argument, explaining:

> We agree that a qualifying agent for a corporation has a duty to supervise a corporation's construction projects, but we find that the failure to meet that duty does not give rise to a private cause of action against a corporation's qualifying agent.
> . . . .
> While chapter 489 provides administrative remedies against a qualifying agent, it does not expressly provide for a civil cause of action. Accordingly, to address the Murthys' claim we must determine whether a cause of action should be judicially implied. **In the past, some courts dealing with this issue have looked to whether the statute at issue imposed a duty to benefit a class of individuals.** Texas & Pacific Ry. v. Rigsby, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874, 877 (1916); Rosenberg v. Ryder Leasing, Inc., 168 So.2d 678, 680 (Fla.3d DCA 1964). **These courts simply concluded that a cause of action arose when a class member was injured by a breach of that duty.** Rosenberg, 168 So.2d at 680. **Today, however, most courts generally look to the legislative intent of a statute to determine whether a private**

9

> **cause of action should be judicially inferred.** Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 15-16, 100 S.Ct. 242, 245-46, 62 L.Ed.2d 146 (1979) ("[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted.")(citations omitted).
>
> . . .
>
> Although we are not bound by the decisions of these courts, **we agree that legislative intent, rather than the duty to benefit a class of individuals, should be the primary factor considered by a court in determining whether a cause of action exists when a statute does not expressly provide for one.** (citations omitted).
>
> . . .
>
> **There is no evidence in the language of the statute or the statutory structure that a private cause of action against a qualifying agent was contemplated by the legislature in enacting this statute.** … Rather, the language of chapter 489 indicates that it was created merely to secure the safety and welfare of the public by regulating the construction industry. "In general, a statute that does not purport to establish civil liability but merely makes provision to secure the safety or welfare of the public as an entity, will not be construed as establishing a civil liability." (citations omitted).

Id. at 985-86 (footnotes omitted)(emphasis added).

Citing Murthy, the Supreme Court in Villazon v. Prudential Health Care Plan, Inc., 843 So. 2d 842, 852 (Fla. 2003), held that a private cause of action does not exist under the HMO Act, Fla.Stat. §§ 641.17-641.3923. The Court explained:

> The Act does not specifically provide a private right of action for damages based upon an alleged violation of its requirements . . . . **There are other regulatory statutes in which the legislature has specifically created a private right of action . . . . Absent such expression of intent, a private right of action is not implied.**

Id. at 852 (citations omitted)(emphasis added); see also Schupbach v. City of Sarasota, 765 So. 2d 131 (Fla. 2d DCA 2000)(city code requiring abutting landowners to maintain public sidewalks did not create a tort duty to individuals injured by landowner's alleged failure to maintain the sidewalk); City of Sarasota v. Windom, 736 So. 2d 741 (Fla. 2d DCA 1999)(individuals had no

private cause of action to challenge city's traffic control devices that violated Fla.Stat. § 316.0745); Mora v. South Broward Hosp. Dist., 710 So. 2d 633 (Fla. 4th DCA 1998)(hospital's failure to report abuse of elderly patient in violation of Fla.Stat. § 415.1034 did not give rise to a civil cause of action against hospital).

The statute cited by Plaintiffs provide specific criminal penalties; however, they contain absolutely no provision for civil liability. See Fla.Stat. § 327.39(6)(c); see also Fla.Stat. § 327.54(6). "In general, a statute that does not purport to establish civil liability but merely makes provision to secure the safety or welfare of the public as an entity, will not be construed as establishing a civil liability." Murthy, 644 So. 2d at 986 (quoting Moyant v. Beattie, 561 So. 2d 1319, 1320 (Fla. 4th DCA 1990)). In the language of Murthy, "[t]here is no evidence in the language of the statute or the statutory structure that a private cause of action . . . was contemplated by the legislature . . . ." 644 So. 2d at 986. "Absent such expression of intent, a private right of action is not implied." Villazon, 843 So. 2d at 852.

Because the Florida Statutes relied upon by the Plaintiffs do not provide for a civil cause of action, and there is no apparent legislative intent that civil liability should be imposed, a violation of those statutes does not constitute negligence per se under Florida law; accordingly, Plaintiffs' Motion for Summary Judgment should be denied.

**III. WATER TOURS IS ENTITLED TO ASSERT ITS LIMITATION OF LIABILITY DEFENSE.**

Plaintiffs argue that Water Tours is not entitled to assert its Limitation of Liability defense under 46 U.S.C. §§ 30501 et seq. because it was per se negligent and because its owners, Gerald Grogan and Jeremy Ray, had the requisite knowledge or privity. For the reasons discussed above, Water Tours was not per se negligent; accordingly, it is entitled to assert its limitation defense.

11

**WHEREFORE**, Defendant KEY WEST WATER TOURS, LC, respectfully requests that this Court deny the Plaintiffs' Motion for Summary Judgment.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy hereof was electronically filed and mailed this 24th day of May, 2007 to: Domingo C. Rodriguez, Esq. and Patricia Leigh McMillan, Esq., Rodriguez, Aronson & Essington, P.A., Attorney for Plaintiffs, 2121 Ponce de Leon Boulevard, Suite 730, Miami, FL 33134; and Jeffrey Wilkerson, 7519 Lone Eagle Drive, Murfreesboro, TN 37128.

> COONEY, MATTSON, LANCE, BLACKBURN, RICHARDS & O'CONNOR, P.A.
> Attorneys for KEY WEST WATER TOURS, LC
> 1600 West Commercial Boulevard, Suite 200
> Fort Lauderdale, FL 33309
> (954) 568-6669
>
> **/s/ Bruce Trybus**
> By: _____
> BRUCE TRYBUS
> Florida Bar No. 972983