IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 4:06-CV-10116-KMM-MOORE-GARBER

MIAMI DIVISION

RONALD TASSINARI, an individual,
and SHEILA SILVA, individually and as
next best friend, ASHLEY SILVA, a minor,

       Plaintiffs,

vs.

KEY WEST WATER TOURS, L.C.,
a Florida Corporation,

       Defendant.
_____/

KEY WEST WATER TOURS, L.C.,
a Florida Corporation,

       Third-Party Plaintiff/Defendant,

vs.

JEFFREY WILKERSON,

       Third-Party Defendant.

_____/

**Plaintiff's Proposed
Findings of Fact and Conclusions of Law**

      This action was tried before the court on July 18, 2007 and July 20, 2007 pursuant to this court's admiralty jurisdiction under 28 U.S.C. § 1333 and Rule 9(h), Federal Rules of Civil Procedure.


1.     Upon consideration of the evidence and testimony presented, the court makes the following findings of fact and conclusions of law.  The court previously entered its order

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

granting summary judgment as to defendant's liability and denying defendant's motions for summary judgment as to exoneration or limitation of liability, and the validity of its alleged release or hold harmless agreement. (DE #69) Defendant withdrew its affirmative defense based on the alleged comparative negligence of Ronald Tassinari prior to trial. Thus, the only issues tried were the nature and extent of damages of Ashley Silva and Ronald Tassinari.

## Findings of Fact

## Introduction

2.      The court heard testimony regarding the injuries sustained by Ashley Silva and Ronald Tassinari from Julie Silva; her mother, Sheila Silva; Ashley Silva , and Co-plaintiff, Ronald Tassinari in court.  Additionally, the court considered the video taped depositions of Miss Silva's treating dentists and doctors in the Boston, Massachusetts, area, including Ashley's pediatrician, Dr. Sabin Sullivan; her dentist, Dr. Renato Carpinito; her periodontist, Dr. Mark DerKazarian; and her orthodontist, Dr. Dr. Michael Abedon.   The parties stipulated to the admissibility of a summary of Ashley Silva's medical and dental records, and to past and future medical bills, subject to defendant's ability to contest some of the future dental bills as speculative.

3.      Regarding Ronald Tassinari's injuries, the court heard Mr. Tassinari's testimony in court and considered the deposition testimony  of Mr. Tassinari's treating doctors, Dr. Porter (primary care physician), Dr. Keehn (chiropractor)  Dr. Gorvin (neuropyschologist), and Mr. Tassinari's supervisor at work, Mr. William McCarthy.. Defendant submitted and the court considered the in court testimony of Dr. Dana Debowsky (Defendant's expert neuropyshologist), and the deposition testimony of Dr. Allan Herskowitz (Defendant's expert neurologist), Darene Cahill (the Physician's Assistant who treated Mr. Tassinari at the Lower Keys Medical Center) and in court testimony of , Jeremy Ray (Co-owner of the

2

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

defendant Key West Water Tours, L.C.) and Defendant's former employee and tour guide, Chris Betz. The court also received into evidence without objection the medical records of Dr. Porter,  Dr. Keehn, Dr. Gorvin and Mr. Tassinari's employment records from the Massachusetts Department of Revenue.  The parties stipulated to the admissibility of a summary of Mr. Tassinari's medical bills and claim for lost wages, subject to Defendant's ability to contest whether the lost wages are related, and to contest the future dental bills as speculative.

### Background and Identification of Parties

4.     Plaintiffs are residents of Massachusetts who were on vacation in Key West during July 2004.  Defendant, Key West Water Tours, L.C. is a Florida corporation operating a business in Monroe County, Florida, renting personal watercraft (PWC) to the members of the public and conducting tours of the waters surrounding Key West. On July 9, 2004, Defendant, Key West Water Tours, L.C., rented personal watercrafts to the plaintiffs and third party defendant, Jeffery Wilkerson, for a guided tour of the waters surrounding Key West.  During the tour, the personal watercraft operated by Mr. Wilkerson collided with the personal watercraft operated by Mr. Tassinari and upon which Ashley Silva was a passenger.  Ashley Silva and Ronald Tassinari sustained  injuries in the accident.

### Testimony of Julie Silva

5.     Julie Silva is Ashley's older sister and currently a student at Boston University.  Julie was 16 years old at the time of the incident, and was 19 years old at the time she testified at trial. Julie was an eyewitness to the accident and observed the offending personal watercraft (PWC) approaching at a high rate of speed.  Julie testified that the PWC was heading directly  towards the PWC upon which her sister and Mr. Tassinari were seated. Mr. Tassinari and Ashley's PWC was stopped dead in the water with the engine turned off

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

as instructed by the tour guide.   Julie observed the impact of the collision, observed Ashley and Ron being struck by the PWC, and being knocked into the water. Both Ashley and Ron were submerged underwater for a few seconds. Naturally, Julie and Sheila were screaming "hysterically" not knowing how seriously Ron and Ashley may have been injured.

6.     After the accident, Julie observed "a lot" of blood on both Ashley and Ron, and in the water. Ron eventually got back on the PWC and helped Ashley aboard. The group then proceeded slowly towards the beach. Once at the beach, the owners of defendant Key West Water Tours L.C. arrived. The Silvas and Mr. Tassinari were taken to the Lower Keys Medical Center via taxi after some "negotiation" with the taxi driver who was initially reluctant to let the group into his taxi because of the bleeding.

7.     Regarding Ashley, Julie testified that she took the last semester off from school and has been spending time with Ashley. Julie testified that Ashley is embarrassed about her appearance because of her facial scars and because of her missing tooth. Julie testified that for the approximately six weeks following the accident, before Ashley received a temporary artificial tooth, called a flipper, from Dr. Carpinito, Ashley refused to go out of the house and only left the house to visit her best friend who lives next door. Julie further testified that Ashley has trouble with the flipper falling out in public places such as at school, which causes Ashley further embarrassment and humiliation. Julie has never seen Ashley take the flipper out in public intentionally.

8.     Julie also testified about the planned surgery to install a permanent dental implant. While on the one hand, Ashley wants to have the procedure, Ashley is very scarred and nervous about having it done. Julie corroborated the testimony of her treating dentists, which will be discussed below, that Ashley has a serious dental phobia. Julie testified that the worst thing that has happened to Ashley as a result of this incident is her loss of confidence and self esteem as a result of her appearance and false tooth.

4

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

9.     Regarding Ron Tassinari, Julie testified that she has know Mr. Tassinari, to whom she refers as Ron, her entire life.  Ron has co-habitated with her mother Sheila and the two girls for about five years. Julie is aware that Ron works for the Massachusetts Department of Revenue and has had "difficulties" with his work since the accident. Since the accident Julie testified that Ron's memory has deteriorated.  Julie gave specific examples of Ron's memory loss, including things like not remembering directions, instructions for take out orders at fast food restaurants and phone numbers.

**Testimony of Sheila Silva**

10.     Sheila Silva is the mother of Ashley and Julie Silva.  Ms. Silva is divorced from Ashley and Julie's father, Roland Silva.  Ms. Silva has known Ron Tassinari since her early twenties when she first started dating Mr. Silva as he and Mr. Tassinari were friends.  Ms. Silva testified that after her marriage with Roland Silva, she and Mr. Silva would socialize frequently with Ronald Tassinari and his then girlfriend, Marie Arboch.  The Silvas were divorced during 2000.  Unfortunately, during September 2001, Ms. Arboch passed away from cancer.   Thereafter, during late 2002, Mr. Tassinari and Ms. Silva began their relationship which continues today.  Mr. Tassinari has been living with Ms. Silva and her daughters since late 2002.  The two girls, Ms. Silva and Mr. Tassinari all testify that Mr. Tassinari is a parental figure and influence on the two girls, like a "second father."

11.     Regarding the accident, Ms. Silva was an eyewitness and described the accident in terms substantially similar to Julie's description.  Significantly, Ms. Silva described that the offending PWC struck Mr. Tassinari on the top of the head, and that both he and Ashley were knocked off the PWC and were submerged underwater for several seconds. Ms. Silva acknowledges that she was screaming for help as she did not know the extent of injuries to Ron or Ashley.

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

12.     Immediately following the accident, Ms. Silva noticed a lot of blood on both Ron and Ashley's faces.  She was immediately concerned about Ashley's teeth.  After returning to the beach, the Silvas and Mr. Tassinari were taken to the Lower Keys Medical Center via taxi where Ashley was examined and treated including sutures to a laceration on her lip, a laceration under her lip on the left side, and two lacerations on her chin.  Ashley also underwent a CT scan of the brain since she had signs of having been hit on the head.

13.     After returning to Boston, Ms. Silva has taken Ashley to most, if not all, of her doctor and dental appointments.   Ms. Silva corroborated Julie's testimony concerning the emotional effects of this accident on Ashley.  Ashley refused to go out of the house, except to see her best friend next door, for almost six weeks after the accident until she received the temporary false tooth - the so-called flipper.  Ms. Silva further corroborated Ashley's severe dental phobia, and described Ashley's emotional conflict over having the procedure, which will be discussed below, for insertion of a dental implant. Ms. Silva also testified about Ashley's desire to have the final result of a permanent dental implant, but that Ashley is very scarred and anxious about the process of having surgery for bone grafting, implantation of the post, and insertion of the permanent crown.  Ms. Silva also testified concerning Ashley's desire to see a skin specialist for micro-dermabrasion or other cosmetic solution to her scars.

14.     Regarding Ronald Tassinari, Ms. Silva testified that a few months following the accident she began noticing memory problems with Ron.  Ms. Silva gave specific examples of instances where Ron can not remember driving directions, phone numbers, fast food orders, appointments and dates.  Ms. Silva testified that she brought this problem to Ron's attention, but he denied any problem and told Sheila she was mistaken.  Over time, Sheila testified, Ron's memory progressively worsened.  The problem with Ron's memory came to a head, according to Ms. Silva, during and after the deposition of Mr. Tassinari taken by defense counsel on August 18, 2006.  Following that deposition during which Sheila, Julie

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

and Ashley Silva all attended, the three Silvas told Mr. Tassinari that he had made many mistakes in his deposition regarding dates, sequence of events, names and places. Only after the Silvas strongly demanded that Mr. Tassinari seek an evaluation of his memory did Mr. Tassinari agree to see Dr. John Govin a neuropyschologist whom Sheila located for him in the Boston area.

15.     Concerning Dr. Deboskey (defense neuropyschologist), Sheila Silva testified that she read Dr. Deboskey's 47 page report dated June 25, 2007. On page 26 of the report, at the bottom of the second full paragraph, Dr. Deboskey made several comments regarding Mr. Tassinari's pre-accident mental state.   Dr. Deboskey attributed these comments to Sheila Silva:

> "For example indicated that Mr. Tassinari pre-morbidly almost never benefitted from feedback or accepted criticism from others. She also said that he almost never was sensitive to the needs of other people. She reported that he almost never got along with other people. She reported that he almost never acted appropriately for his age."

When asked about these alleged comments, Ms. Silva denied making the comments or that she felt they were true. On the contrary, Ms. Silva testified that she never spoke with Dr. Deboskey about these topics. The only interaction Ms. Silva had with Dr. Deboskey involved filling out a questionnaire, which both Ms. Silva and Dr. Deboskey testified Ms. Silva found "confusing."

**Testimony of Ashley Silva**

16.     Ashley Silva was 13 years old at the time of the accident, and was 16 ½ years old at the time of trial.  Ashley testified that she lives in Medford, Massachusetts with her mother, Sheila Silva; her sister, Julie Silva and her mother's significant other, Ronald Tassinari.  Ashley is a student at Medford High School and will begin the 11th grade this

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

fall.  Ashley aspires to work in the fashion design business following completion of her education.

17.     Ashley does not have much recollection of the accident.  Ashley recalls sitting on the PWC with Ron, and then being in the water.  Ashley recalls blood everywhere and returning slowly to shore.

18.     The court observed Ashley's scars both in person and in photographs submitted during the direct examination of Sheila Silva which included both before and after accident photographs.  The court also observed Ashley's false tooth (flipper) which she removed and demonstrated to the court.  Ashley has been using the flipper since August 2004 and will continue to use the flipper until her orthodontic treatment is over, and her permanent dental implant is completed.

19.     Ashley testified that the flipper causes her difficulty in eating certain foods, occasionally falls out in public places such as school when she sneezes, coughs or sometimes simply while talking.  Clearly, Ashley has been and will continue to be embarrassed by the trouble with her flipper.

**Testimony of Ronald Tassinari**

20.     Ronald Tassinari is a 47 year old employee of the Massachusetts Department of Revenue where he has been employed for 17 years.  Mr. Tassinari currently resides with Sheila Silva and her two daughters, Ashley and Julie.  Prior to establishing a relationship with Sheila Silva during late 2002, Mr. Tassinari had been involved in a long term, 19 year, relationship with his girlfriend, Marie Arboch.  Tragically, Ms. Arboch passed away during September 2001 from cancer.

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

21.    Approximately a year after Ms. Arboch's death, Mr. Tassinari and Ms. Silva began their relationship.  Mr. Tassinari has lived with Sheila and her daughters since late 2002, approximately 5 years.  However, as testified by Ms. Silva, Ron and Sheila have known each other since their early 20s.

22.    Before the accident, Mr. Tassinari had a stable job at the Massachusetts Department of Revenue (DOR) as a tax examiner.  At the DOR, Mr. Tassinari received periodic and annual evaluations.  The significance of the evaluations, among other things, is that in order to receive a raise an employee must receive a satisfactory or "meets" final evaluation for the year.  Prior to the accident, from 1990 to 2003, Mr Tassinari received a satisfactory annual evaluation for every fiscal year, except for fiscal year 2003, the year following the death of Ms. Arboch.

23.    Additionally, Mr. Tassinari was involved in many outdoor activities, including race car driving, snow mobiling, hiking, and recreational boating.  Since the accident, Mr. Tassinari testified that he has given up much of his pre accident activities, except for occasional recreational boating with the Silvas.  Mr. Tassinari testified that after the accident he attempted an automobile race, but was unable to judge his speed and distance as he approached turns.  As result, Mr. Tassinari did not enjoy the experience and has since given up racing.  For similar reasons, Mr. Tassinari has given up the sport of snow mobiling which he enjoyed on most winter weekends before the accident.

24.    Regarding Ms. Arboch's death, Mr. Tassinari took a leave of absence of approximately two months.  When he returned, he was reassigned to the mail room for approximately 9 months and ultimately returned to his job as tax examiner.  During that time, Mr. Tassinari sought counseling and was prescribed medication for depression related to grief over Ms. Arboch's passing.

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

25.     When Mr. Tassinari returned to his job as a tax examiner, he had a new supervisor, Mr. William McCarthy.  It is significant to note that for fiscal year 2004, Mr. McCarthy gave Mr. Tassinari an overall "meets" evaluation.  The accident in question occurred approximately two weeks later while on vacation in Key West.

26.     Regarding the accident, Mr. Tassinari recalls seeing the offending PWC approaching at a high rate of speed heading in his direction.  The last thing Mr. Tassinari recalls prior to impact is seeing the PWC about 25 feet away from his PWC.  The next thing Mr. Tassinari recalls is being in the water choking.  Mr. Tassinari testified that he realized that his lip was cut and causing water to enter his mouth choking him even though his mouth was closed.  He took physical inventory to make sure that his arms and legs were working and then looked for Ashley.  Mr. Tassinari boarded his PWC and helped Ashley aboard.  Mr. Tassinari noted that Ashley was bleeding extensively from her face and mouth.  At that point the party headed for the nearby beach and with the help of the tour guide, took a taxi to the Lower Keys Medical Center for emergency medical care. Mr. Tassinari was not examined by a medical doctor.  The focus of attention and care was on Ashley.  Mr. Tassinari was seen, and his lip laceration was sutured, by a Physician's Assistant, Nurse Cahill.

27.     Upon return to Massachusetts, Mr. Tassinari first saw his primary treating doctor, Dr Francis Porter on July 15, 2004 for removal of the sutures in his lip.  Subsequently, Mr. Tassinari complained of headaches and blurry vision.  He was seen by his chiropractor, Dr. Keehn; neurologist, Dr. Albert Fullerton; ophthalmologist, Dr. Philip Gendelman, and orthopedist, Dr. Michael Thompson.  (The narrative reports of these specialists were received into evidence as part of Dr. Porter's medical records without objection.)  Mr. Tassinari under went MRI of the brain, MRI of the knee, CT scan of the head and an EEG, all of which were normal. Nevertheless, Mr. Tassinari was diagnosed with "trauma with symptoms of a concussion." See report of Dr. Gendelman dated July 28, 2004 contained

10

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

within the medical records of Dr. Porter, which were received into evidence.

28.    Since the accident, Mr. Tassinari has been reported to have problems with his memory as discussed in the preceding sections concerning the testimony of Julie and Sheila Silva.  After the accident, since fiscal year 2005, Mr. Tassinari has received "below" evaluations by his supervisor, and has received three suspensions from his job at the DOR for poor performance.  It is significant to note that Mr. Tassinari never received any suspension during the preceding 14 years he worked at the DOR.  Mr. Tassinari is now at risk of losing his job at the DOR due to his poor performance.

### Injuries sustained by Ashley Silva and related Medical/Dental Care

29.    As more fully will be described below Ashley Silva sustained the following physical injuries:

   a.    Ashley was struck in the head, face and legs causing pain and bruises.
   b.    Ashley suffered the total permanent loss of one of her upper front teeth (tooth no. 8).
   c.    Ashley suffered a fracture of the upper portion of her jaw, called the buckle plate, which holds the front upper teeth in place.
   d.    Ashley fractured the adjacent upper front tooth, no. 9, losing about 1/3 of the incisor portion of the tooth.
   e.    Ashley suffered two lacerations on her chin requiring sutures and resulting in permanent scars.
   f.    Ashley suffered another laceration through the left end of her lower lip resulting in a visible scar on the outside, and a lumpy scar on the inside of her lip which she occasionally bites accidentally causing pain and bleeding.
   g.    Ashley suffered another laceration under the right side of her lower lip

11

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

requiring sutures and resulting in a permanent scar.

h.   At the time of the accident Ashley had an orthodontic appliance in her mouth called a NANCE spacer in preparation for orthodontic work she needed before the accident.  The breakage of the spacer caused "moderate pain" and was repaired and ultimately removed by her orthodontist.

30.   Ashley's treatment thus far has included:

a.   The NANCE spacer had to be repaired and then removed.

b.   About a week after the accident, a fractured piece of bone (buckle plate) sloughed off, coming through the gum and had to be removed by Dr. DerKazarian.

c.   Ashley suffered a significant aggravation of her pre-existing dental phobia requiring that Ashley take Valium at times before dental appointments.

d.   Ashley had bonding to the fractured tooth.   Bonding is notoriously troublesome especially on a front upper tooth because it is vulnerable to fracture while biting into food.  Ashley has already required rebonding of the fractured tooth two times.

e.   Ashley has a temporary plastic false tooth, called a flipper.  It no longer fits well, it is too small and is constantly falling out which causes her embarrassment.

31.   Ashley's future dental treatment will include:

a.   Surgical installation of a permanent dental implant for the lost tooth.  This will require three surgical procedures over a period of time as long as 18 months, possibly longer, once her orthodontics is completed.

12

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

i.      The first surgical procedure will be a bone graft.  An incision is made inside the mouth above the teeth and the gum is peeled down to expose the bone; a bony composite material is then packed into place and the incision is closed with sutures.

ii.     Approximately four to six months later, after the bone graft is healed, a second surgical procedure is done.  Similar to the first procedure, an incision is made and if the graft was successful, a post is drilled and screwed in the upper jaw as a base for the crown.  If the graft is not successful, a second attempt must be made.

iii.    Assuming the graft is successful, after approximately another 4 to 6 month period of healing, a third similar surgical procedure is done to install the implant.  Following healing of this procedure, Ashley will require restorative dentistry to her adjacent teeth for aesthetic reasons.

iv.     During Dr. Carpinito's most recent dental x-ray he saw a lesion on the root of a tooth adjacent to the lost tooth which concerns him, and may require root canal, or possibly a replacement crown.

v.      According to Dr. Carpinito due to the severity of mobility of all of Ashley's upper and lower anterior teeth, she is at risk of requiring root canals and possibly crowns on all those teeth in the future.

### Testimony of Dr. Mark DerKazarian

32.    Dr. Mark DerKazarian is a periodontist who first treated Ashley Silva on July 12,

13

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

2004, three days after the subject accident.  Dr.DerKazarian described that periodontics is the field of dentistry that deals with diseases of the mouth known as periodontitis, and also functions in placing dental implants, corrective periodontal surgery and periodontal plastic surgery.  See deposition of Dr. DerKazarian page 6. Line 13 through 18.

33.    Dr. DerKazarian has an independent, clear recollection of Miss Silva's initial visits to his office.  Dr. DerKazarian recall that on Ashley's second visit when he actually did some treatment on her, Miss Silva was "quite nervous" (See deposition of Dr. DerKazarian, page 12, line 17 -23).  A procedure Dr. DerKazarian said should have taken five minutes took an  hour and a half "just because she was very anxious."  See deposition of Dr. DerKazarian, page 12, line 21-23.

34.    Based on the initial visit and Ashley's age at the time, the initial plan of action required that several years pass before a dental implant can be done.  According to Dr. DerKazarian,  it is necessary for skeletal growth to finish; otherwise, especially in the anterior (front) teeth, if the implant is placed too early, it can be out of position.  See deposition of Dr. DerKazarian, page 13, line 15 through page 14, line 13:

Q:    She's referred over to you all by her orthodontist, and you take a look at the fractured teeth and, what do you envisage as a plan of action for her at that point?

A:    Well, it's a tough plan of action when you're talking about a 13-year-old girl because you're envisioning treatment to be done, but it can't be done for several years.
In girls you need to wait until at least – there's no definitive age, but you're talking at least 16 and a half to 17 before dental implants can be placed.

Q:    Why?

A:    Because that's about when females finish skeletal growth. Especially in the anterior, if you place it too early and they finish skeletal growth, the dental implant can be out of position.

14

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

35.     Regarding the fractured buckle plate, Dr. DerKazarian testified that he removed the fractured portion.  Dr. DerKazarian explained:

> "...when she came initially, it was very soon post-trauma, so you don't really know if that's going to heal on its own, if the patient will naturally avulse it, if that buckle plate will come out.
> So we left it alone because she had stitches in, from what I remember at the time, and we wanted to give her a couple of weeks to allow that to heal.
> She came in at two weeks after the initial visit.  That piece of bone was still there.  Bone that's in the oral environment at that point is nonvital bone, dead bone. So we need to remove that just so proper healing can occur."

See deposition of Dr. DerKazarian page 15, lin 3 though 16.

36.     After removing the bone, Dr. DerKazarian was asked if that left adequate bone for an implant in due course.  Dr. DerKazarian explained:

> "In her case, when I initially saw her, when we initially saw her in '04, it looked like she was going to be really a complete buckle plate resorption. That's what it looked like initially.
> I was contemplating, when I saw her originally, I thought that we'd be looking at a what's called a ramus graft to try to fix the area, which involves removing a portion of  her ramus, part of the ascending jaw, and moving it, transplanting it to this section.
> At the last visit in '05, I stated that bone has healed well enough, I feel what's called a GBR, guided bone regeneration, can be done instead of ridge graft. That's what I wrote, which is good news for the patient, it's less traumatic. And I do those in cases where I feel like there's not enough bone to be able to stabilize a membrane.  It's a membrane that we use to support a, instead of a solid piece of bone, it's particles of bone that you can pack into an area and attain increased thickness of bone that way.
> So we don't know until we actually get in there and surgically do it how much we'll be able to do, but at this point I'm optimistic that we won't have to take pieces of bone from her in other places and move them around."

See deposition of Dr. Derkazarian page 16, line 17 through page 17, line 21.

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

37.   Dr. DerKazarian explained how a guided bone regeneration is done:

Q:   ...How do you do a guided bone regeneration?

A:   Guided bone regeneration is a – it can be done multiple ways, but the main premise of it is to, if you dissect the word, it's to guide bone to regenerate in a certain area.
Guided bone regeneration by its definition includes using some sort of a cell-occlusive membrane that prevents soft tissue from growing into a site. Guided bone regeneration may involve placement of a bone graft material. Sometimes it does, sometimes it doesn't, depends on how the individual practitioner wants to do the procedure.
In my case, I when I do guided bone regeneration, it involves preparation of the deficient site. What I mean by preparation is you will actually make holes in the cortical bone to allow is good blood supply to the area.

Q:   Let me stop you there.

A:   Sure.

Q:   First, before you get to that, how do you – you're talking about doing surgery?

A:   Yes, absolutely. You have to reflect all the soft tissue in the area.

Q:   When you say reflect the soft tissue in the area, what you're talking about is that you make an incision inside her mouth above her teeth and the gum, and you peel the gum down and expose the bone?

A:   Yes.

Q:   And then you take the –

A:   You take a small —

Q:   After you peel the gum down, you take some kind of composite bone material?

A:   Yes, yes.

Q:   And you place it in where the buckle plate used to be?

16

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

A:      Yes.

Q:      And then you put the gum back and stitch it into place?

A:      Yes, except –

Q:      I missed a step.  What you were talking about was you drill some hole or –

A:      We drill some holes into the bone that's there first.

Q:      Into the existing bone?

A:      So we get some bleeding in the area.  It's all about blood supply.  You place this composite bone graft material.
        What I usually use in these areas an autogenous bone from a donor source, human donor source.  That's what works best in this area.  Then you place this cell-occlusive membrane, this covering on top of it, and then the gum tissue comes back over.

Q:      And then you stitch it back up?

A:      Yes, yeah.

Q:       And then that has to heal.

A.      Yes.

Q:      Okay. How long does that have to heal?

A:      Six months.

Q:      Okay. And during that six month period of time is Ashley, will she be able to use the, what been referred to as a flipper?

A:      Yes, yes.  We may have to reshape it a little bit, but yes.

Deposition of Dr. DerKazarian page 30, line 9 through page 32, line 24.

38.   Dr. DerKazarian continued explaining the procedure:

17

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

Q:    ...After you wait six months, then what do you do?

A:    At that point a dental CT scan needs to be taken so we can determine three
dimensionally the shape and the height of the bone.

Q:    You'd have to determine whether or not the bone graft has taken?

A:    And to what level it's taken.  Bone grafts by nature are never 100 percent.
You put in X amount of bone and you get so much after, and usually you get
a certain amount of shrinkage of the bone.
So you always kind of plan for that, over pack the area, and the x-ray will
show us how thick and how tall the bone is so we know what size implant we
can place.

Q:    Okay. So let's assume you do the first step, wait the six months, you do the
CT scan, the CT scan shows that you have enough bone there to continue
on.  Describe for us what the next procedure would be.

A:    The next procedure itself is the actual placement of the dental implant.  It
involves an incision in the gum tissue very similar to the incision made for the
bone graft, guided bone regeneration.
Same technique in that you have to reflect or peel back the gum tissue,
expose the bone.  You then have to basically prepare or drill a hole in the
bone itself using a very – it can be anywhere from five to seven small drills,
incrementally increasing the size to create this hole, if you will.
Then the implant, if you look at the implant, it's a self-tapping screw is what
it is, and it gets torqued into the site.  We put a small, what's called a cover
screw on top of the implant and completely close the site.  And that heals for
another anywhere from four to six months.

Q:    Okay, so this is a second surgical procedure?

A:    Yes, yes.

Q:    Okay. And you use local anesthesia?

A:    Local anesthesia.

Q:    So the patient is awake while you're doing this cutting and drilling and stuff?

A:    Yes, yes.  We do on occasion give people oral sedative things, medications
to help them relax a little bit.

18

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

But, I do not do any kind of intravenous conscious sedation or anything like that, so everyone is awake.

Q:    So after the second surgical procedure, you have to wait another six months?

A:    Yeah, it could be as low as four, but six months is not an unusual amount of time to wait.

Q:    Then what's your next step?

A:    We call it the third surgery, if you will, will be what's called a Stage 2 or uncovering procedure.
It's a surgical procedure, so we have to anesthetize again and make another incision, but all in all , it's a smaller procedure. What you're doing is basically uncovering the implant, and you do that in multiple ways.
You remove the small cover screw that we put on initially, and oftentimes put on a longer healing abutment, which is in essence a metal cylinder that protrudes through the gum tissue and allows the soft tissue to heal around it.
In a case like Ashley's, because it is an anterior case, we may decide instead of a healing abutment, we decide to either have a laboratory fabricate a temporary crown to be put on at the time of the second stage surgery, or I might make one myself, custom make one right here in the office.

Q:    Well, maybe you lost me there, but would she have some type of prosthetic tooth in there or during that healing process would there be a —

A:    That's my hope, that's always the hope at Stage 2, to be able to deliver something temporary but that's fixed in place. So at that point hopefully she can not have to use the flipper anymore.

Q:    All right.  There's a possibility that she would not have – she wouldn't be able to use the flipper, but she wouldn't have anything in the space?

A:    Right.  She would have a gap in there and we don't want that.

Q:    Okay, then what's the next step after that?

A:    At that point, from a periodontal standpoint, implant standpoint, we're done. She then goes off to her restorative doctor anywhere from four to six weeks after the last surgery and be in the restorative process, which in the anterior

19

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

can take anywhere from three to six weeks.

Q:     Define for me what you mean by restorative process.

A:     At that point, impressions need to be taken of the implant itself.  It's called
       an implant level impression.  The dentist and his or her laboratory will use
       that impression to fabricate a custom abutment, most likely.  This is all
       speculative as far as how they're going to treat it, but usually a custom
       abutment gets made in the anterior.  And the custom abutment is tried in,
       and oftentimes an abutment level impression is taken, so a custom crown
       can be make on top of that.

Deposition of Dr. DerKazarian page 33, line 13 through page 38, line 3.

39.   When asked if injury to anterior central teeth in young girls present any special

problems, Dr. DerKazarian responded:

       "Well, a central anterior tooth is to me and to most of my colleagues in
       periodontics it's the hardest tooth to do because of the aesthetic
       complications involved with it."

Q:     What are the aesthetic complications?

A:     No matter how well a laboratory can make a crown, it is extremely
       difficult to match it to natural teeth.  It's why oftentimes when a dental
       implant gets placed in an area or even if just a single crown gets put
       into a tooth, they oftentimes will crown or veneer or do something on
       the tooth adjacent to it so they match.  I don't - I haven't been able to
       assess Ashley's smile line, how high up her lip goes when she smiles.
       When the implant gets placed, especially in a case where you've had
       trauma to the bone, you're kind of limited on how well you can place
       the implant on an angulation standpoint.
       The implant, you can build bone in the area, but it's always particularly
       difficult to get the implant in the ideal, perfect location.  So there'll be
       limitations and there will be compromises along the way.
       One of the compromises may be that this implant crown ends up
       being longer than the adjacent teeth, and that can be an aesthetic
       problem if she has a high smile line.  And if she does have a high
       smile line, you could be looking at possibly, and this becomes all

20

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

aesthetics, having to crown or veneer some other teeth in the area to make it an aesthetic outcome that we want.

If the implant happens, and when it gets restored, the implant crown is say 13 millimeters long, just to put out a hypothetical number, and her remaining teeth are 11 millimeters long, you may be looking at procedures to increase the length of those teeth and subsequently to aesthetically match them to the implant crown.

Deposition of Dr. DerKazarian page 38, line 15 through page 40, line 6

40.     Referring to Ashley's nervousness or dental phobia, Dr. DerKazarian was asked if he recalled if she was anxious during the visit when he removed the avulsed buckle plate.

Q:      Okay, and it's your recollection that she was anxious during that visit?

A:      Very, I mean, I remember it clear as day.  In fact, I was talking to my office staff, and everyone remembers that date because it was like a 12:00 appointment, and I usually take lunch at 1:00, and at 1:30 she was still here. And this is something that shouldn't take more than five minutes, ten minutes, and everyone was really anxious, including her father was very anxious, it was a stressful time for them....

Deposition of Dr. DerKazarian page 22, line 15 through page 23, line 10.

**Testimony of Dr. Michael Abedon**

41.     Dr. Abedon is Ashley Silva's orthodontist.  Dr. Abedon treated Miss Silva before the accident in question for approximately two years and was preparing her for orthodontic treatment.  Dr. Abedon testified that pre accident, Miss Silva had crowding of the upper and lower front teeth for which she needed braces.  See deposition of Dr. Michael Abedon, page 6, lines 11 through 17.  Treatment began in March 2002 and consisted of installing spacers while she still had baby teeth and then braces when she was ready. See deposition of Dr. Abedon, page 6, lines 11 through 25.  Dr. Abedon explained that the

21

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

spacer, called a NANCE spacer, is cemented in place until the patient is ready for braces. See deposition of Dr. Abedon, page 8, line 6 through 20.  Miss Silva still had the NANCE spacer cemented in her mouth at the time of the accident.  Dr. Abedon saw Miss Silva on July 12, 2004, three days after the accident.  Dr. Abedon's note of that visits states:

> "Patient hit by a jet ski in the face, 7/9/04.  Saw Dr. DerKazarian who said a Maryland bridge may be in order.  Also there is a bone sliver in the upper right central area, upper right central was avulsed, upper left central edge is fractured off. Spoke to Dr. DerKazarian.  He told them they should wait a week.  The buckle plate may slough off.  Then she will need a bone graft.  They should see her in two weeks unless she is having a problem sooner."

Deposition of Dr. Abedon, page 10, line 8 through 16.  Dr. Abedon testified that in "plain English" the foregoing meant that:

> "...I saw the patient was hit by a jet ski. Dr. DerKazarian said that she would need some kind of a bridge replacement of the tooth, that there is – because of the accident the bone was broken in the affected area.  The tooth was knocked out.  And the tooth next to it on the left had the edge fractured off.  Dr. DerKazarian told them that he should wait a week and that the buckle plate  – that's the bone - may slough off which means it isn't any longer permanently attached and would come off through the bone and out of her mouth and then she would need a bone graft because of that."

Deposition of Dr. Abedon, page, 10, line 21 through page 11, line 7.


42.     Dr Abedon further explained that the loss of the tooth affected his orthodontic treatment.


Q:     Were there orthodontic sections of the mouth that needed stabilization because of this incident?

A:     Absolutely.

Q:     Could you explain that?

22

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

A:    Well, the tooth that had been lost would need a replacement which would mean that I would have to deal with that replacement.  It's not the same as dealing with a tooth that is in the mouth.  It makes it more complicated.  Also, that the - because of the accident, it looked like part of the space maintainer had been broken.   So that affected the space maintainer and necessitated replacing it.

Q:    That's the NANCE?

A:    The NANCE, the space maintainer.

Deposition of Dr. Abedon, page 12, line 6 through 19.

43.    Dr. Abedon continued to explain that his involvement in treating Miss Silva after the accident involved assuring that the temporary false tooth, known as a flipper, would fit with his appliances.  See deposition of Dr. Abedon, page 13, line 2 through 7.  Dr. Abedon continued to follow Miss Silva and collaborate with Dr. DerKazarian, a periodontist, and Dr. Carpinito, Miss Silva's general dentist, who fitted Miss Silva with the temporary "flipper." See Deposition of Dr. Abedon, page 13, line 13 through page 14, line 17.

44.    Dr. Abedon has continued to treat Miss Silva through the time of trial.  Miss Silva is still in braces.  Dr. Abedon testified that the injury suffered in the accident, specifically the loss of a tooth complicated and prolonged his orthodontic treatment of Miss Silva.  See deposition of Dr. Abedon, page 29, line 10 through 18.

45.    Dr Abedon testified that he has known Miss Silva for approximately five years at the time of his deposition and had the opportunity to observe Ashley's demeanor and reaction to the injury and losing her tooth.  Dr Abedon that Miss Silva's was "very anxious about it, extremely."  Deposition of Dr. Abedon, page 28, line 21 through page 29, line 2.

46.    Finally, Dr. Abedon testified that replacement of the NANCE spacer probably

23

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

resulted in moderately significant pain for Miss Silva.  <u>See</u> deposition of Dr. Abedon, page 31, line 2 through 6.

## Testimony of Dr. Renato Carpinito

47.     Dr. Carpinito is a general dentist in Medford, Massachusetts, who has treated Ms. Silva since before the accident of July 9, 2004.  Dr. Carpinito first saw Miss Silva following the accident on August 11, 2004, a little more than a month after the date of injury.  On that first visit, Dr.Carpinito noted that Miss Silva was "severely traumatized" and that prior to the accident she had a "big dental phobia" severe enough to require Valium to calm her down enough to get her into the office.  <u>See</u> deposition of Dr. Carpinito page 33, line 8 through line 21.  Dr. Carpinito noted that tooth number 8 was lost, tooth number 9 had "plus two mobility" and Miss Silva was seeing her orthodontist.  <u>See</u> deposition of Dr. Carpinito, page 10, lines 7 through 15.  Dr. Carpinito removed three "baby teeth" during that visit in preparation for her orthodontic treatment, which was unrelated to the injuries sustained in the accident.  However, Dr. Carpinito could not even touch tooth number 9, which was fractured, and "even taking a picture was a traumatic thing."  <u>See</u> deposition of Dr. Carpinito page 33 line 19 through 21.

48.     Dr. Carpinito described grade 2 mobility in the fractured tooth number 9 and commented that this is "not good."  Mobility of teeth, Dr. Carpinito explained is graded on a scale of 1 to 3, with 3 indicating that the tooth is almost falling out.  <u>See</u> deposition of Dr. Carpinito, page 11, lines 2 through 6.  At that time, more than a month after the accident, there was so much mobility in the tooth, Dr. Carpinito could not even touch the tooth.  This was in part due to pain (Deposition of Dr. Carpinito page 34, line 1 - 2) and in part due to Miss Silva's extreme emotional distress and dental phobia (Deposition of Dr. Carpinito page 33, line 17 -21).

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

49.     In describing the consequences of sustaining a blow to the teeth causing significant mobility Dr. Carpinito explained:

Q:      Okay. As a dentist, are you able to say within reasonable dental probability that he (referring to Mr. Tassinari) will have problems in the future because of the incident?

A:      There's always a small probability, yes, he could have. Sometimes any time you get a traumatic blow to any teeth, you might not see any symptoms for many, many years.  It could be ten years, 15 years.  It could be next year or it could be next week.

Q:      Okay. How is it that you can experience problems for the first time ten years after a traumatic event?

A:      When you get a traumatic blow, it damages nerve, and sometimes the body can fight off that damage, and all of a sudden the nerve can die slowly and you get a lesion.

        And with time, you can get discoloration of the teeth.  You might even need root canals, posts, crowns, depending what can happen.  You can go a whole lifetime and have no symptoms.

Deposition of Dr. Carpinito page 8, line 13 through page 9, line 8.

50.     Specifically regarding the consequence of Miss Silva's traumatic blow to the mouth resulting in mobility of her teeth, Dr. Carpinito testified as follows:

Q:      In terms of the potential that she would need a root canal because of nerve damage, are the chances of that about the same as the chances of Mr. Tassinari having nerve problems down the line?

A:      No, hers is greater because her mobility was much greater.  She has a very good chance of having some nerve damage, not just to tooth no. 9, possibly no. 10, 7, 6.

Deposition of Dr. Carpinito, page 17, line 8 through 16.

25

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

51.    Miss Silva returned to Dr. Carpinito on August 19 at which time he took impressions in order to make a temporary false tooth, the so-called flipper.  Miss Silva returned on August 25, 2004 at which time the temporary partial bridge, or flipper was delivered.  Also at that time, Dr. Carpinito bonded the adjacent tooth, no. 9, which had been fractured, with a resin material to aesthetically restore the tooth to what it should look like.  Dr. Carpinito testified that Miss Silva lost approximately one third of the incisor portion of tooth number 9. See deposition of Dr. Carpinito, page 15, line 23 through page 16, line 1.

52.    In addition to the injuries to teeth numbers 8 and 9, Dr. Carpinito testified that all of Miss Silva's front (anterior) teeth, upper and lower, were loose or mobile.  As of March, 2007, when Dr. Carpinito's deposition was taken, Dr. Carpinito had observed a small lesion starting the area of the root of tooth number 10.  See deposition of Dr. Carpinito, page 41, line 11 through page 42, line 17.  The significance of this lesion is that it represents potential damage to the nerve for that tooth which may progress and require further treatment (See deposition of Dr. Carpinito page 41, line 10 through page 42, line 17):

    Q:    Okay. Now, if that lesion progresses of if she becomes symptomatic, like sensitivity or discoloration, then what would happen?

    A:    And then we'd proceed right to the root canal and the post and crown.

Deposition of Dr. Carpinito, page 42, line 21 through 25.

53.    Regarding the immediate future of tooth no. 9, Dr. Carpinito testified that Miss Silva will likely require either a Lumineer or a crown.  Dr. Carpinito testified that none of these remedies are permanent, and they will likely need replacement in the future.  This treatment is not merely for cosmetic purposes, but also for strength of the tooth.  See deposition of Dr. Carpinito page 23, line 19 through page 24, line 14.

54.    Regarding replacement of the lost tooth, Dr. Carpinito provided testimony similar to

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

Dr. DerKazarian summarized above. Miss Silva will likely require three surgical procedures including bone grafting, implantation of a post and finally, implantation of the crown. See deposition of Dr. Carpinito page 19, line 13 through page 23, line 10. Possible complications include that the bone graft will not take and have to be redone or infection (See deposition of Dr. Carpinito page 22, lines 10 - 18 and page 45, line 6 -24); fracture of the post (See deposition of Dr. Carpinito page 22, line 19 through page 23, line 3); and the average life expectancy of the crown is seven to ten years (See deposition of Dr. Carpinito page 22, line 1-2).

**Testimony of Dr. Sabin Sullivan**

55.    Dr. Sullivan has been Ashley Silva's pediatrician since July, 2003. Dr. Sullivan saw Ashley following the accident on July 20, 2004. Dr. Sullivan's examination revealed that Ashley had sutured lacerations on her lip and chin, nine of which were removed. Dr. Sullivan noted, but did not specifically document that Ashley had "evidence of significant dental trauma." Deposition of Dr. Sullivan page 8, line 18 -20. The following visit during August, 2004, Dr. Sullivan removed the absorbable sutures which were still present in the lip. Dr. Sullivan also recommended the use of a lotion, Maderma, to help with the healing of the scars.

56.    Dr. Sullivan was aware that Ashley had a significant anxiety issue with going to the dentist and prescribed Valium. Deposition of Dr. Sullivan pate 14, line 3 - 10.

**Injuries sustained by Ronald Tassinari and related medical and dental care**

57.    Ronald Tassinari suffered the following injuries in the accident:

a.    a bloody nose.

27

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

b.      a laceration through his right lower lip requiring sutures with a permanent
        scar.

c.      Loosening of all of his anterior, upper and lower, teeth, which resolved but
        may cause problems in the future requiring root canal or crowns.

d.      Loss of memory, concentration, cognitive function caused by either a mild
        traumatic brain injury and/or severe aggravation of pre-existing depression
        manifesting itself in the documented loss of memory, concentration and
        cognitive function.

e.      A blow to the top of his head resulting in symptoms consistent with post
        concussion syndrome.

### Testimony and medical records of Dr. Francis Porter

58.     Dr. Porter is Mr. Tassinari's primary care provider and has been practicing medicine
in the same location for over 25 years.   Dr Porter saw Mr. Tassinari on July 15, 2004
primarily to have his sutures removed from his lacerated lip.  Deposition of Dr. Porter, page
7, generally.  Dr. Porter first saw Mr. Tassinari on September 24, 1996.  Deposition of Dr.
Porter, page 23, line 18 -20.  Between September of 1996 and November 13, 2000, Dr.
Porter saw Mr. Tassinari for a number of routine medical issues.  The first mention of
depression is documented on November 13, 2000 when Mr. Tassinari reported to Dr.
Porter that his long time girlfriend was ill with breast cancer.  Although Mr. Tassinari was
understandably sad by his girlfriend's illness, Dr. Porter noted that he "smiles at times and
does not appear clinically depressed."  Deposition of Dr. Porter page 29, lines 10 - 11.

59.     The first note of significant sadness is dated September 18, 2001, approximately
one week following the death of Marie Arboch.  Mr. Tassinari saw Dr. Porter on that date
and appeared  "tearful and crying" at times.  Dr. Porter subsequently diagnosed an "acute
grief reaction secondary to Marie's death of 9/10/01." See Deposition of Dr. Porter, pages
29 through 31, generally.  During this time Dr. Porter prescribed anti-anxiety and anti-

28

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

depression medication and recommended counseling.

60.     In general, Dr. Porter testified that Ron's reaction to, and seeking counseling following, Marie's death was appropriate for a person who lost a loved one at a young age. Deposition of Dr. Porter page 34, line 15, through page 36, line 14.

61.     By June 4, 2002, Dr Porter testified that Mr. Tassinari showed significant improvement:

> The visit that I saw him, June 4, '02, was to do a physical exam to document he was in good physical shape to be able to drive a race car, and my recollection is he seemed to have gotten his equilibrium back, psychologically, equilibrium that is, pretty well at that point.  He was smiling and happy and talking about going I think to New Hampshire to drive race cars with his friends, and I think he was back doing pretty well at that point.

Deposition of Dr. Porter page 37, line 1 through 10.

62     Referring to the June 4, 2002 office visit, Dr. Porter testified:

> Q:     Did he discuss during the June 2002, visit anything about the loss of Marie or depression or was he tearful or crying or anything like that?

> A:     Not to my recollection, no.  He seemed to be excited about the prospects of driving a car fast.

> Q:     And your notes don't reflect that he was tearful or crying or –

> A:     They do not.

Deposition of Dr. Porter page 37, line 11 - 19.

63.     Following the accident, Dr. Porter referred Mr. Tassinari to a neurologist and an

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

opthalmologist for complaints of headache and blurry vision.  Deposition of Dr. Porter page 38, line 11 - 18.  The narrative reports of the these specialists are contained in Dr. Porter's medical records received into evidence without objection.  As discussed below in the section regarding the testimony of defense neurology expert, Dr. Herskowitz, these specialist diagnosed and found evidence that Mr. Tassinari suffered "trauma with symptoms of concussion."  See Report of Dr. Gendelman dated July 28, 2004 contained within the medical records of Dr. Porter received into evidence at trial.

64.    Finally, on May 12, 2006, Mr. Tassinari returned to Dr. Porter, now almost two years after the accident in question.  Mr Tassinari reported that he was having problems at work and was subject to disciplinary action.  It was Dr. Porter's impression that Mr. Tassinari was seeing a psychologist who recommended neuropsychological testing.  Dr. Porter concurred that such testing was appropriate at that time.  See Deposition of Dr Porter page 39, line 9 through page 40.  Dr. Porter's working diagnosis at that time was to "rule out post-concussion syndrome" Deposition of Dr. Porter, page 40, line 9 -10.

**Testimony and records of Dr. Andrew Keehn**

65.    Dr. Keehn has been a practicing Chiropractor for 21 years and has treated Mr. Tassinari since 1997.  It is undisputed that Dr. Keehn treated Mr. Tassinari for complaints throughout his spine, including lower, mid and cervical spine, intermittently for many years.

66.    Dr. Keehn saw Mr. Tassinari on July 14, 2004, five days following the accident.  At that time Mr. Tassinari complained of pain in his mid back, right shoulder and left knee.  Dr. Keehn examined and made positive findings, including limited range of motion in the right shoulder.  Mr. Tassinari did not again complain of right shoulder pain after the first post accident visit and that injury apparently resolved.  Nevertheless, he continued to complain of pain though out his back and had an MRI performed on his knee.

30

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

67.    Dr. Keehn continued to treat Mr. Tassinari.  It is apparent from Dr. Keehn's records that Mr. Tassinari's frequency of visits after the accident increased significantly.  In the twelve calendar months preceding the accident, Mr. Tassinari saw Dr. Keehn four times; however, in the twelve calendar months following the accident, Mr. Tassinari saw Dr. Keehn 13 times.  Thus, it is fair to say that Mr. Tassinari's treatment with his Chiropractor tripled in frequency for the twelve months following the accident.  <u>See</u> Deposition of Dr. Keehn page 27, line 8 through page 28, line 15.  During these visits after the accident, Mr. Tassinari complained of stiffness and soreness, which Dr. Keehn relates to the accident. <u>See</u> Deposition of Dr. Keehn page 29, line 13 -18.

68.    In summary, Dr. Keehn testified that the chiropractic treatments rendered to Mr. Tassinari from July 14, 2004 through the end of November, 2004 were clearly related to the injuries sustained and/or aggravated in the PWC accident of July 9, 2004.  <u>See</u> Deposition of Dr. Keehn page 28, line 16 through page 29, line 18.

## Testimony and report of Dr. John Gorvin

69.    Dr. John Gorvin's deposition and report dated February 7, 2007 were admitted into evidence without objection.  Dr. Gorvin has an undergraduate degree in psychology from Stonehill College in Massachusetts, a Master's Degree in counseling psychology from Boston College and a Doctoral Degree in Clinical Psychology from the Florida Institute of Technology in Melbourne, Florida.  Dr. Gorvin was certified in Clinical Neuropsychology by the Fielding Institute in 2005.  Dr. Gorvin has been practicing as a clinical psychologist on a full time basis for 17 years.  <u>See</u> Deposition of Dr. Gorvin, page 75 line 18 through page 76, line 8.

70.    Dr. Gorvin performed a battery of neuropsychological tests on Mr. Tassinari.  Dr. Gorvin explained that the tests he performed are designed to

31

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

"...measure brain function in many different areas of cognitive capacity, and they are designed to evaluate a person's current status in terms of their functioning in the various areas, ranging from general intellectual abilities, verbal skills, language fluency, memory, attention and concentration, executive skills, reasoning, problem solving, and motor skill and dexterity."

Deposition of Dr. Gorvin, page 76, line 23 through page 77, line 6.

71.    Dr. Gorvin also met with and interviewed Sheila Silva as part of his evaluation. <u>See</u> Deposition of Dr. Gorvin, page 77, line 23, through page 78, line 8.

72.    As result of the testing performed on Mr. Tassinari, Dr. Gorvin testified that in his opinion Mr. Tassinari suffered a traumatic brain injury as a result of the injuries sustained during the accident of July, 2004.  Specifically, Dr. Gorvin testified as follows:

Q:    All right.  In general, do you have an opinion based on neurological, neuropsychological probability as to whether or not Ron Tassinari suffered a traumatic brain injury as a result of the WaveRunner accident in July 2004 in the Florida Keys?

A:    Yes, I believe he did.

Q:    Okay, And you tell us what the basis of your opinion is?

A:    That is based on a couple of things.  His description and Sheila's description of the nature of his deficits now compared to his level of functioning before, I have his self-report and her independent corroboration, and also her additional report of the deficits as she sees them.
And also largely based on the administration of the tests on those two dates in question that I gave him, and then my review of his performance on the tests using the various norms and data sources in looking at standard scores, comparing him to the norm sample, which by and large are normed on, you know, representative sample of the general population using modern statistical methods.

Q:    And can you describe for the Court what in your opinion is the nature of the injury that he sustained, the brain injury?

A:    He sustained a traumatic brain injury in my opinion in this accident, and this injury has resulted from his being struck by the jet ski or WaveRunner and

32

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

caused to fall from his own jet ski and – well, let me back up – being struck by the jet ski or WaveRunner, striking his head, I believe – I forget the young girl's name.

Q:     Ashley.

A:     Ashley, I was going to say.  The back of his head on the front of her jaw or lower half of her face, and the two of them falling, being knocked from the jet ski as a result of these various impacts and landing in the water.

Deposition of Dr. Gorvin page 80, line 24 through page 82, line 14.

73.    On questioning by defense counsel Dr. Gorvin testified that he found deficits in memory, attention and concentration.

Q     One of the things you say you found as a result of your tests is that he suffered from memory problems, correct?

A:     Yes, that's correct.

Q:     Also, attention and concentration difficulty?

A:     Yes, that's correct.

Q:     Is it not true that, irrespective of whether a person has a traumatic brain injury, that they can perform poorly on tests designed to look at memory, attention, and concentration if they're suffering from depression?

A:     That can sometimes occur, yes.

Deposition of Dr. Gorvin, page 23, line 14 through 25.

74.    It should be noted that Mr. Tassinari never denied suffering from prior depression and freely admitted this to Dr. Gorvin.

33

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

Q:     ...Mr. Tassinari told you that he suffered from depression prior to this accident?

A:     Yes, that's correct.

Q:     And did he tell you why?

A:     Yes, he did.

Q:     And what did he tell you?

A:     That his girlfriend of 19 years I believe died as a result of cancer.

Q:     And when was that?

A:     September, 2001.

Q:     Okay. So he didn't deny the fact that was depressed and was treated by a psychologist for depression before the accident?

A:     Correct.

Q:     He didn't try to hide that in any way?

A:     No, that's correct.

Deposition of Dr. Gorvin page 83, line 10 through page 84, line 1.

75.     Regarding permanency of the deficits, Dr. Gorvin testified that he believed that the deficits in memory, concentration and attention are permanent considering that, at the time of his deposition, it was two and half years post accident.  See deposition of Dr. Gorvin, page 84, line 2 through 17.  Nevertheless, Dr. Gorvin believes Mr. Tassinari is a candidate for some cognitive rehabilitation considering his over all intelligence and some aspects of his memory being good as compared to others.  See deposition of Dr. Gorvin, page 84, line 18 through 25.

76.     Concerning Dr. Gorvin's testing and findings, it is important to highlight some of the findings and comments contained in Dr. Gorvin's report.  On page 6 of his report Dr. Gorvin comments on the results and interpretation of memory testing:

34

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

"Ron's effort on memory testing was intact, based upon TOMM scores within normal limits . There is no evidence of willful effort to perform poorly on these results. Ron performed better on visual memory testing than verbal memory tasks, even when he had opportunity for repetition and practice of verbal memory tasks. His delayed memory is slightly worse on some tasks compared to immediate memory, but not consistently so across all test administered. *This greater verbal memory difficulty compared to visual memory difficulty is affected by impaired executive functions, and is suggestive of slight, lateralized impairment in the left, dominant hemisphere. These impairments are consistent with traumatic brain injury, and consistent with Sheila's reporting that, since the accident, Ron's memory is "not 100%" and that now he forgets what you tell him "in five minutes.""* (emphasis added)

77.     On page 7 of his report, Dr. Gorvin comments as follows concerning concentration test results:

"Ron performs within normal range for brief concentration tests, but has difficulty with more sustained tests and also time limited tests requiring rapid and accurate performance. The accuracy of his performance declines when he rushes or when information is more complex and presented rapidly. He has difficulty sustaining his focus, is easily distracted, and misses critical information as a result of this distractibility. This deficit in attention also adversely affects his executive skills and functions, discussed below."

78.     On page 9 of his report, Dr. Gorvin discusses executive skills and frontal lobe impairment:

"Ron displayed difficulty with carelessness and impulsivity in his approach to executive tasks, and performed below the expected level compared to overall intellectual abilities. He did not always listen to directions thoroughly before responding. He was able to correct initial errors he made, but not consistently. Ron performs better when he takes his time and thinks through problems carefully, instead of responding quickly and resorting to a trial and error problem solving approach. When Ron works too quickly, he makes careless errors, loses his focus, and tends to preseverate and had difficulty switching cognitive sets. *This reflects impaired executive skills, processing speed, concentration, planning, and reasoning, all indicative of frontal lobe impairment, consistent with the nature of his head injury, and a direct result of the accident. These executive skill deficits directly contribute to his difficulty at work since the accident and his diminished productivity.*"

35

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

(emphasis added)

79.    Finally, on page 10 of his report, Dr. Gorvin comments on Mr. Tassinari's emotional functioning, an issue that will come more into focus when discussing the testimony of Dr. Dana Deboskey, defendant's expert witness.

> "Ron's approach to this testing was characterized by being open and honest, and readily acknowledging his difficulties.  *There is no indication that he either exaggerates or minimizes his problem areas.*
>
> * * *
>
> *Ron experiences moderately severe depression since his accident.... While Ron acknowledges some prior depression and treatment before the accident, the cognitive sequella of this accident has had a significant effect on his life has exacerbated his depression."*

### Testimony of Defense Expert Neurologist, Dr. Allan Herskowitz

80.    In essence, defense expert Dr. Allan Herskowitz offered the opinion that Mr. Tassinari did not suffer a gross neurological injury as a result of this incident.  <u>See</u> Deposition of Dr. Herskowitz page 16, line 18 through 23.  Plaintiff, Mr. Tassinari, however, does not and has never claimed that he suffered a gross neurological injury in this accident.

Nevertheless, on cross examination Dr. Herskowitz offered the following testimony:

"*... the hallmark of a concussion is the brain is normal.  When you do a CAT scan or an MRI scan or an exam, you typically find everything normal"*

Deposition of Dr. Herskowitz's, page 20, line 21 through 24 (emphasis added.)

81.    Referring to Dr. Herskowitz' review of Mr. Tassinari's medical records, Dr. Herskowitz offered the following testimony:

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

Q:      ...You reviewed the records of the neurologist that he (Mr. Tassinari) was referred to, Dr. Fullerton, a couple of months following the accident.  Do you see that?

A:      Yes.

Q:      And at that time, according to the notes and the records you reviewed, he was still having blurred vision.

A.      Yes.

Q:      And he was still having bifrontal headaches, worse on the right.

A:      Yes.

Q:      And he was still having difficulty with focusing his eyes.

A:      Yes.

Q:      He found it difficult to read small print, and he was having difficulty processing information.

A:      Yes.  That was Dr. Fullerton's history, yes.

Q:      Would you agree that that is two months following the accident with Mr. Tassinari still having those symptom, that that supports or is consistent with a diagnosis of a concussion?

A:      Yes, You can see the symptoms after a concussion.  You're basically at the mercy of the subjective because these complaints are hard to objectify.

Q:      But as you said, a person can have a normal, a grossly normal neurological examination, a normal MRI, a normal CT scan, a normal EEG, but that doesn't mean that they didn't suffer a concussion.

A:      Correct.

Deposition of Dr. Herskowitz page 21, line 10 through page 22, line 15.


82.    Further, based on a hypothetical question asked of Dr. Herskowitz based on Mr.

37

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

Tassinari's trial testimony (See deposition of Dr. Herskowitz page 24 and 25), Dr. Herskowitz admitted that Mr. Tassinari's medical history is "*not inconsistent with a finding of concussion with symptoms with cognitive loss*." Deposition of Dr. Herskowitz page 25, lines 18 -20 (emphasis added).

83.     Dr. Herskowitz further testified that he did a brief mental status test on Mr. Tassinari that was mildly abnormal.  See Deposition of Dr. Herskowitz page 31, line 21 through page 33,  line 19.

84.     Specifically referring to his mental status examination, Dr. Herskowitz testified as follows:

Q:     It's certainly not inconsistent with someone who had a concussion and is suffering from mild cognitive and memory deficits as a result of the concussion.

A:     Well, yes, You could see that in a mild case.  But again, based on that alone, I certainly wouldn't make any kind of diagnosis.  The people that we see that have significant cognitive impairment do a lot worse in other aspects.

Q:     I'm not suggesting that Mr. Tassinari has a severe or even moderate brain injury. But the type of findings in your tests was completely consistent with some...
And your review of the records, in fact, are completely consistent with someone who had a ... struck in the head, suffered a concussion and has a mild cognitive and memory deficit.  Would you agree with that?

A:     It's possible.  I mean, if the history all fits into place as you say.

Q:     You don't rule that out.  Based on your neurological examination, you cannot rule out that Mr. Tassinari suffered a mild cognitive and memory impairment as a result of the this accident.

A:     No, but I think what's important to know is that theoretically anybody that has a head injury, who has any one of minor...
You know, basically by having a head injury and having one of many things,

38

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

you can make a diagnosis of concussion.

I think that what's more important is did it leave any damage because everybody who gets hit on the head, has a spotty memory loss, has some headaches and dizziness is very common.

What we're concerned about, as neurologists, is okay, well, you know, what damage did it leave.  And I think that's the issue.

Subjectively here, if he was hit on the head and had these things, his diagnosis could be that of a very mild concussion.  But it just didn't appear that the sequella was significant.

Q:     But you, as you mentioned previously, you defer to the neuropyschologist in that respect.

A:     For the cognitive impairment aspect, yes.  If he has any residual, yes.

Deposition of Dr. Herskowitz page 32 , line 25 through page 34, line 19.

85.    Thus, in summary, Dr. Herskowitz agrees that Mr. Tassinari showed symptoms consistent with a concussion with cognitive loss; that a grossly normal neurological examination does not rule out cognitive or memory loss; that his own mental status test performed on Mr. Tassinari was mildly abnormal; and, finally that he defers to the neuropyschologist regarding findings of cognitive or memory impairment.

**Testimony of Defense Expert Neuropyschologist, Dr. Dana Deboskey**

86.    Dr. Deboskey is defendant's neuropyschologist who testified that Mr. Tassinari did not suffer a brain injury, in her opinion, in the subject accident.   Nevertheless, Dr. Deboskey's testimony largely supports the basic premise of Plaintiff's symptoms of loss of memory, concentration, poor work performance all of which have either arisen from or have been worsened since the accident.   Dr. Deboskey believes that Mr. Tassinari is a gentleman of above average intelligence who has underachieved throughout his life.  Yet, Dr. Deboskey concedes that prior to the accident Mr. Tassinari was involved in a long term relationship and had stable employment with the Massachusetts Department of Revenue.

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

Dr. Deboskey further concedes that prior to the accident Mr. Tassinari had only one overall unsatisfactory yearly evaluation by his employer, that evaluation occurred within a year and a half of his girlfriend's death.  Cross examination of Dr. Deboskey, page 19.

87.     For the fiscal year which ended immediately prior to the accident, Dr. Deboskey concedes, although she was initially confused, that Mr. McCarthy, Plaintiff's supervisor at the DOR, gave him a satisfactory or "meets" yearly evaluation. And, finally, Dr. Deboskey concedes that since the accident Mr. Tassinari has received consistently unsatisfactory evaluations and three suspensions.  It is undisputed that prior to the accident Mr. Tassinari was never suspended for poor performance.

88.     Dr. Deboskey believes that Mr. Tassinari has emotional and cognitive deficits.

> Q:     And on page 26 of your report, you do believe that he has cognitive and emotional deficits.
>
> A:     I think he experiences periodic cognitive issues.  They don't manifest in his test scores. But they manifest at times in his everyday life.
>
> Q:     The fact that he was, in your opinion, an underachiever and that he has preexisting emotional and personality problems, that doesn't explain, does it, that following the accident, where he generally gets acceptable evaluations, he has not had one acceptable evaluation and that every one after the accident had been unacceptable?
>
> A:     I think what explains it is that there's been increasing depression and anxiety that explains it.
>
> Q:     Do you think the accident caused his anxiety and depression to worsen?
>
> A:     I don't think the accident related to brain injury did it.  I couldn't rule out the fact that it was another incident that he can't deal with well because he can't deal well with incidents that are outside the normal realm.

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

Q:     So, even though you don't think that he has mild traumatic brain injury.  But you do believe that his depression and his overall emotional status has been effected by this accident in such a way that his depression has worsened and that that manifests itself in the poor memory that has been described by Ms. Silva and the two girls.

A:     *A definite combination.  I can't put a percentage on it....*

Cross Examination of Dr. Deboskey page 21 line 21 through page 22, line 25. (emphasis added)

89.     Thus, although Dr. Deboskey does not believe Mr. Tassinari has any brain damage from the accident, she agrees that the results of the accident affect his emotional and psychological status manifesting in the symptoms, i.e, poor memory and cognitive deficits, of which Mr. Tassinari complains.

90.     Further, Dr. Deboskey elaborated on her opinions:

Q:     You said that his highest elevations are on depression, anxiety and what you used, the scary sounding term, psychopathic deviant.

A:     That's correct, on the MMPI.

Q:     And you believe that those have worsened since the accident.  Some of those, he had preexisting the accident.  And you believe that they have worsened since the accident.

A:     *I think they have worsened since the time of the accident.  But I don't relate the elevations totally to the accident.*

Cross examination of Dr. Deboskey page 24, line15 -25 (emphasis added).

Again, Dr. Deboskey reaffirmed her view that the accident, at least partially, contributed to Mr. Tassinari's  worsening psychological symptoms.

41

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

91.    Finally, in light of Dr. Deboskey's opinions concerning Mr. Tassinari, Dr. Deboskey was asked to consider a hypothetical question:

Q:    Doctor, I'll ask you to consider the following hypothetical.  Consider that Mr. Tassinari was in a long term relationship before the accident, that had a grief reaction following the death of his girlfriend, that he had a long term job where he was receiving fairly stable evaluations for many years, that the accident in question occurs, and that following the accident in question, he now receives absolutely unacceptable across the board evaluations on his job and his significant other reports that, since the accident, she has observed a progressively worsening problem with his memory.
Do you have an opinion as to whether or not Mr. Tassinari's involvement in this accident caused or contributed in any way, directly or indirectly, to his worsening emotional and mental status?

A:    In my opinion, his work relationship and his boss is the primary issue. The secondary issue is the fact, as I said a number of times before, *he has longstanding personality problems related to dealing with crises and this, to him, was a crisis.*

Q:    So, the answer is yes, it has contributed to some degree to the worsening of his mental status?

A:    *I would say that it has been another thing that he has had difficulty dealing with. * * * He's an individual who's kind of crashing and he's looking for support, as many people do, for why this is happening. And the reality is that the accident is an event that's outside the norm but would not typically, given the normal population, have this kind of effect.*

Q:    But we're talking about Mr. Tassinari here.

A:    We are.

Q:    And you've told us that he comes to us with some emotional and psychological baggage.

A:    He does.

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

Q:   But nonetheless, he is able to maintain in a relationship and able to maintain a job for a long period of time.  He does, correct?

A:   Correct.

Q:   *And then we have this accident which he perceives as being a crisis which, following your theory of Mr. Tassinari, causes him to have more anxiety, more depression which manifests itself in many ways. And now, to use your own words, he's crashing and burning.  He's now an emotional and psychological train wreck.*

A:   *Right, But you've got to remember a lot of that is his own internal issues, and it's not related to the accident.*

Q:   *Well, just ... You just told me that it was related to the accident because it triggered his depression to become worse.*

A:   *Okay, But I'm telling you that the incident took place.  And over a three year period, the normal thing that would happen is people would get better.   But he hasn't.   And he hasn't because he has this personality issue.*

Cross examination of Dr. Deboskey page 25, line 1 through page 27, line13.  Thus, assuming for the sake of argument, that Dr. Deboskey's theory is correct, Mr. Tassinari had preexisting psychological and emotional problems, including the inability to deal well with a crisis situation.  As Dr. Deboskey says, this accident was a crisis for him.  Mr. Tassinari has not dealt well with this crisis because of his psychological makeup thereby the accident at least in part, according to Dr. Deboskey, contributes to his continued symptoms of depression, anxiety, poor memory, lack of concentration and lack of cognitive skills.

92.     It should also be noted that Dr. Deboskey is an expert who has served as an expert for defense counsel in this matter in four cases.  In this case, Dr. Deboskey has charged expert witness fees of $14,500 for her testimony through trial.

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

**Testimony of Darene Cahill, Physician's Assistant**

93.    Ms. Cahill's testimony establishes that Mr. Tassinari suffered a blow to his face causing a laceration of his lip requiring sutures.   Ms. Cahill did not testify that she performed a neurological examination of Mr. Tassinari, and Mr. Tassinari was not evaluated by a medical doctor for potential neurological problems while at the Lower Keys Medical Center.

**Testimony of William McCarthy and Employment Records**

94.    As of 2006, Mr. Tassinari was earning the annual salary of $55,850.50 per year. <u>See</u> Plaintiff's employment records admitted into evidence.   It is undisputed that Mr. Tassinari has been employed continuously with the Massachusetts Department of Revenue since 1990 and currently hold the position of Tax Examiner II.

95.    Mr. McCarthy has been with the DOR for 31 years and has been Mr. Tassinari's supervisor for the past 5 years.  Deposition of Mr. McCarthy page 9, line 17 - 24.  Mr. McCarthy explained that the DOR has a yearly performance evaluation system which involves three stages running through the course of the fiscal year which begins on July 1st of each year.  See generally Deposition of Mr. McCarthy pages 13 - 17.

96.    Mr. McCarthy testified that Mr. Tassinari has received three suspension within the past two years for progressive discipline. Deposition of Mr. McCarthy page 33, line 4 through page 34, line 4. McCarthy explained that progressive discipline suspension are given when an employee is not meeting production expectations in terms of both quantity and quality. Deposition of Mr. McCarthy page 31, line 21-22.  Mr. McCarthy testified that after a five day suspension, which Mr. Tassinari already had, "he could lose his job." Deposition of Mr. McCarthy page 34, line 10-13.

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

97.    It is undisputed that for the fiscal years of 1990 through 2002, Mr. Tassinari received satisfactory or "meets" evaluations on his all of his annual, fiscal year end, evaluations. See generally, Deposition of Mr. McCarthy pages 70 through 77.   In fiscal year 2003, shortly after Marie Arboch's death, Mr. Tassinari did receive an overall "below" evaluation. Nevertheless, as of June 23, 2004, approximately two weeks before the subject accident Mr. McCarthy gave Mr. Tassinari an overall "meets" evaluation for that fiscal year.   It is similarly undisputed that every fiscal year end evaluation since the accident, Mr. Tassinari has received an overall "below" and that as a result thereof and the three aforementioned suspensions Mr. Tassinari is in grave danger of losing his job which he has held at the DOR for seventeen (17) years.

### Conclusions of Law

98.    This court has personal jurisdiction over the parties and subject matter jurisdiction over this controversy as a result of a collision between two personal water craft occurring on navigable waters within the territorial waters of the State of Florida pursuant to 28 U.S.C. § 1333.

### Damages of Ashley Silva

99.    The court concludes as a matter of law that the injuries sustained by Ashley Silva as described in paragraph 29(a-h) above were caused by the accident in question and the negligence of the defendant herein.   The court further finds that the medical/dental treatment described in paragraphs 30 and 31 are necessary, reasonable and related to the accident in question.   The court specifically finds that Miss Silva will have the need for future dental care as testified by Dr. Carpinito and that dental care is causally related to this accident.   Finally, the court finds that Ashley Silva suffered extraordinary mental pain and suffering, in part, as the result of her undisputed dental phobia and the specific nature of

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

her injuries. The court therefore awards damages to Ashley Silva as follows:

| | |
|---|---|
| Stipulated Total past and future medical/dental bills | $10,566.58 |
| Future dental bills per Dr. Carpinito | $13,000.00 |
| Past physical pain & suffering, including disfigurement mental anguish, disability & impairment | $100,000.00 |
| Future physical pain & suffering, including disfigurement mental anguish, disability & impairment | $300,000.00 |
| **Total damages of Ashley Silva** | **$423,566.58** |

### Damages of Ronald Tassinari

100.   The court finds that the injuries of Ronald Tassinari as described in paragraph 57 (a-e) above were caused by the accident in question and the negligence of the defendant herein.  The court further specifically finds that Ronald Tassinari has suffered an injury affecting his memory, cognitive function and executive skills.  Regardless of whether the court accepts the testimony of Dr. Gorvin or the opinions of defense expert, Dr. Deboskey, the result is the same.  Dr Gorvin believes Mr. Tassinari's mental deficits are the result of a mild brain injury sustained during the subject collision.  Dr. Deboskey, on the other hand, believes Mr. Tassinari's mental deficits are related, in part, to his preexisting psychological makeup.  The law on this circumstance, however, is clear.

101.   The fact that Mr. Tassinari may have been predisposed to his current mental status is irrelevant to an award of damages for his current condition for which, even Dr. Deboskey agrees is due, at least in part, to the accident in question.

46

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

102.    The Restatement (Second) of Torts § 461, entitled Harm Increased in Extent by Other's Unforeseeable Physical Condition, states:

> The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man. should have foreseen as a probable result of his conduct.

103.    A tortfeasor takes the victim as he finds him and is responsible in damages for consequences of his tort even though the damages are greater because of the victim's prior condition.   When the defendant's negligent act aggravates a preexisting condition or injury, the victim is entitled to compensation for the full extent of the aggravation. Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 494 (5th Cir. 2002).  Here, Dr. Deboskey admits she can not allocate a percentage of Mr. Tassinari's damages to his preexisting condition as compared to what may have been caused by the accident.  See paragraph 88 above.

104.    The "eggshell skull" doctrine requires a defendant to compensate a plaintiff for unforeseeable injuries flowing from some pre-existing physical condition. Dahlen, 281 F.3d at  495, citing Munn v. Algee, 924 F.2d 568, 576 (5th Cir.1991) (citing Rest. 2d of Torts § 461 (1977)).  Section 461 of the Restatement Second of Torts, "Causal Relation Affecting the Extent of Liability But Not Its Existence," defines the doctrine more specifically as follows:

> The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct.

> An illustration given in the Restatement provides:

> A, a schoolboy, during school hours, inflicts a slight kick upon the shin of B, a fellow

47

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

student. Ordinarily the kick would have caused only a slight sensation of pain, but because of a latent infection it has serious consequences. A is subject to liability to B for the full extent of his injuries.

Comment a, provided in the Restatement, states:

The rule stated in this Section applies not only where the peculiar physical condition which makes the other's injuries greater than the actor expected is not known to him, but also where the actor could not have discovered it by the exercise of reasonable care, or, indeed even where it is unknown to the person suffering it or to anyone else until after the harm is sustained. A negligent actor must bear the risk that his liability will be increased by reason of the actual physical condition of the other toward whom his act is negligent.

105.    The rule, as applied to Dahlen, provided that if a further unforeseeable injury occurs to a victim with a pre-existing condition due to a tortfeasor's negligence, that tortfeasor will still be held liable for the increased damages. Id., citing Perniciaro v. Brinch, 384 So. 2d 392, 396 (La.1980) ("Where the defendant's negligent action aggravates a pre-existing injury, he must compensate the victim for the full extent of this aggravation.").

106.    In response to Defendant's contention that Mr. Tassinari was susceptible to depression, as he had suffered depression prior to the incident at bar, it is well settled that there is no "reverse eggshell" doctrine available to argue for reduction of an award for damages pertaining to mental pain and suffering. Johnson v. Clark, 484 F.Supp.2d 1242, 1258-59 (M.D. Fla. 2007):

... Plaintiff's evidence of emotional injury was fairly substantial and was corroborated by the testimony of his treating psychiatrist and other witnesses. The evidence was that Plaintiff, like the plaintiff with the "eggshell skull" discussed in law-school classes, was relatively fragile and easily damaged by the type of attacks in which Defendant engaged. The Court disagrees with Defendant's contention that the damages award should be remitted to a "nominal" amount.

48

Ronald Tassinari, et al vs. Key West Water Tours, L.C.
Case No: 4:06-CV-10116-KMM-MOORE-GARBER.

107.    The court further finds that Mr. Tassinari's claim for lost wages in the past due to lost sick time following the accident, uppaid suspensions due to poor performance related to his injuries, lost raises, and lost future wage claims are credible in light of the foregoing.

108.    Therefore, the court awards damages to Mr. Tassinari as follows:

| | |
|---|---|
| Stipulated Total medical/dental bills | $8,929.00 |
| Lost past wages and raises | $5,836.38 |
| Past physical pain & suffering, including disfigurement mental anguish, disability & impairment | $75,000.00 |
| Future physical pain & suffering, including disfigurement mental anguish, disability & impairment | $200,000.00 |
| Loss of future earnings & earning capacity | $180,000.00 |
| **Total damages of Ronald Tassinari** | **$469,765.38** |

It is hereby Ordered and Adjudged that the Plaintiff, Ashley Silva, shall recover from Defendant, Key West Water Tours, L.C. the sum of **$423,566.58** together with prejudgment interest from the date of accident in accordance with the general rule of admiralty, taxable costs and attorney's fees, if applicable; it is further Ordered and Adjudged that Plaintiff, Ronald Tassinari shall recover from Defendant, Key West Water Tours, L.C. the sum of **$469,765.38** together with prejudgment interest from the date of accident in accordance with the general rule of admiralty, taxable costs and attorney's fees, if applicable.  The court reserves jurisdiction to tax attorney's fees and costs upon filing of timely motions.

Done and ordered at Miami, Dade County, Florida on this ___ day of _____, 2007.

_____
Honorable K. Michael Moore
United States District Court Judge

cc: All counsel of record.

## CERTIFICATE OF SERVICE

THE UNDERSIGNED CERTIFIES that on February _____, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or by some electronic form of service and/or via facsimile 954/ 568-0085, to:

Bruce Trybus, Esq.
COONEY, MATTSON, LANCE, BLACKBURN, RICHARDS & O'CONNOR, P.A.
P.O. Box 14546
Ft. Lauderdale, Florida 33302

Joshua Brankamp, Esq.
COONEY, MATTSON, LANCE, BLACKBURN, RICHARDS & O'CONNOR, P.A.
1600 West Commercial Boulevard, Suite 200
Fort Lauderdale, Florida 33309

Jeffrey Wilkerson, *Pro Se*
7519 Lone Eagle Drive
Murfreesboro, Tennessee 37128
obsvr@bellsouth.net

/s/     Domingo C. Rodriguez, Esquire
        Florida Bar No.: 394645
        Domingo@rodriguez-aronson.com
        P. Leigh McMillan Minoux, Esq.
        Florida Bar No.: 624543
        Leigh@rodriguez-aronson.com
        RODRIGUEZ, ARONSON & ESSINGTON,
        P.A.
        2121 Ponce de Leon Boulevard, Suite 730
        Coral Gables, Florida 33134
        T+     305/ 774-1477
        F+     305/ 774-1075