UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
IN ADMIRALTY

Case No. 06-10116-CIV-MOORE/GARBER

RONALD TASSINARI, an individual, SHEILA
SILVA, individually, and as next best friend of
ASHLEY SILVA, a minor,

           Plaintiffs,

vs.

KEY WEST WATER TOURS, L.C., a Florida
corporation,

           Defendant.

**CLOSED
CIVIL
CASE**

_____

KEY WEST WATER TOURS, L.C., a Florida
corporation,

           Third-Party Plaintiff,

vs.

JEFFREY WILKERSON,

           Third-Party Defendant.
_____/

## FINAL ORDER

THIS ACTION was tried before this Court on July 18, 2007 and July 20, 2007 pursuant to the Court's admiralty jurisdiction under 28 U.S.C. § 1333 and Rule 9(h), Federal Rules of Civil Procedure. The Court previously entered its Order (dkt # 69) granting summary judgment as to Defendant's liability and denying Defendant's Motion for Summary Judgment. Defendant withdrew its affirmative defense based on the alleged comparative negligence of Ronald Tassinari prior to trial. Thus, the issues tried were the nature and extent of damages of Ashley Silva and Ronald Tassinari and whether Defendant is entitled to contribution from Third-Party

Defendant Jeffrey Wilkerson ("Wilkerson").

UPON CONSIDERATION of all the evidence and testimony presented, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Introduction

The Court heard testimony regarding the injuries sustained by Ashley Silva and Ronald Tassinari from Julie Silva; her mother, Sheila Silva; Ashley Silva, and Co-plaintiff, Ronald Tassinari, in court. Additionally, the Court considered the video-taped depositions of Miss Silva's treating dentists and doctors in the Boston, Massachusetts, area, including Ashley's pediatrician, Dr. Sabin Sullivan; her dentist, Dr. Renato Carpinito; her periodontist, Dr. Mark DerKazarian; and her orthodontist, Dr. Michael Abedon. The Parties stipulated to the admissibility of a summary of Ashley Silva's medical and dental records, and to past and future medical bills, subject to Defendant's ability to contest some of the future dental bills as speculative.

Regarding Ronald Tassinari's injuries, the Court heard Mr. Tassinari's testimony in court and considered the deposition testimony of Mr. Tassinari's treating doctors, Dr. Porter, his primary care physician; Dr. Keehn, his chiropractor; Dr. Gorvin, a neuropsychologist; and Mr. Tassinari's supervisor at work, Mr. William McCarthy. Defendant submitted and the Court considered the in-court testimony of Dr. Dana Debowsky (Defendant's expert neuropsychologist), and the deposition testimony of Dr. Allan Herskowitz (Defendant's expert neurologist), Darene Cahill (the Physician's Assistant who treated Mr. Tassinari at the Lower Keys Medical Center) and in-court testimony of Jeremy Ray, co-owner of Defendant Key West

Water Tours, L.C.; and Defendant's former employee and tour guide, Chris Betz. The Court also received into evidence without objection the medical records of Dr. Porter, Dr. Keehn, Dr. Gorvin and Mr. Tassinari's employment records from the Massachusetts Department of Revenue. The Parties stipulated to the admissibility of a summary of Mr. Tassinari's medical bills and claim for lost wages, subject to Defendant's ability to contest whether the lost wages are related, and to contest the future dental bills as speculative.

## II. The Accident

Plaintiffs are residents of Massachusetts who were on vacation in Key West during July, 2004. Defendant Key West Water Tours, L.C. ("Defendant" or "Water Tours") is a Florida corporation doing business in Monroe County, Florida, as a personal watercraft (jet skis and/or waverunners) rental agency, renting personal watercraft to the members of the public and conducting tours of the waters surrounding Key West.

On July 9, 2004, Defendant rented personal watercraft to Plaintiffs and Third-Party Defendant, Jeffrey Wilkerson, for a guided tour of the waters surrounding Key West. During the tour, the personal watercraft operated by Mr. Wilkerson collided with the personal watercraft operated by Mr. Tassinari and upon which Ashley Silva was a passenger. Ashley Silva and Ronald Tassinari sustained injuries in the accident.

Just prior to the accident, the tour guide, Christopher Betz ("Betz")[1] signaled for everyone taking the tour to gather or congregate their personal watercraft into a "tight group" in the vicinity

---

[1] Betz had not "successfully completed a boater safety course approved by the National Association of State Boating Law Administrators and this state" as required by Fla. Stat. §327.54. Therefore, Betz was not qualified to give proper instruction in safe-handling of personal watercraft and Defendant was negligent in allowing Betz to give that instruction and negligent in allowing the members of the tour that day to control the watercraft without proper instruction.

3

of the tour guide's personal watercraft for further spoken instruction and identification of points of interest on the tour. See Trial Transcript at 230–31. After the tour guide made the signal, members of the tour began gathering together into the "tight group." Id. After all the other members of the tour had congregated, Wilkerson and "one of his buddies" remained out riding around on their personal watercraft.

The tour guide left the congregated group to "chase" after Wilkerson and his friend to tell them to gather with the rest of the group. Wilkerson's friend returned to the congregated group first, and the tour guide continued to chase after Wilkerson until he caught up with him. The tour guide testified that when he caught up, he told Wilkerson to "come into the group nice and slow." Id. at 231. The Court finds that the tour guide told Wilkerson to join the congregated group.

The tour guide quickly returned to the congregated group of personal watercraft, turned off his engine, and floated into a 180 degree turn to face back the way he had come. At this point, the tour guide saw Wilkerson coming toward the group at "a very high speed." Id. at 231. According to the tour guide, "that's when the accident happened." Id. The Court finds that Wilkerson, without proper training and experience, panicked as he approached the congregated group.

Wilkerson's personal watercraft collided at a high rate of speed with the personal watercraft on which Plaintiffs Ronald Tassinari and Ashley Silva were seated. Plaintiffs sustained physical injuries to their heads and faces in the collision. Plaintiffs were knocked into the water and submerged for a few seconds.

After the accident, witnesses observed "a lot" of blood on both Ashley and Ron, and in the water. Ron eventually got back on the PWC and helped Ashley aboard. The group then

proceeded slowly towards the beach. Once at the beach, the owners of Defendant Water Tours arrived. The Silvas and Mr. Tassinari were taken to the Lower Keys Medical Center via taxi.

At the Lower Keys Medical Center, Ashley was examined and treated including sutures to a laceration on her lip, a laceration under her lip on the left side, and two lacerations on her chin. Ashley also underwent a CT scan of the brain since she had signs of having been hit on the head. Mr. Tassinari was seen, and his lip laceration was sutured by a Physician's Assistant. Much of the medical focus at this initial visit to the Medical Center was on Ashley because medical personnel and Plaintiffs themselves did not believe Ronald Tassinari's injuries to be very serious. After returning to Massachusetts, both Plaintiffs were seen by several professionals, doctors and dentists regarding their injuries.

### III.   Injuries sustained by Ashley Silva and related medical/dental care

1. Ashley Silva sustained the following physical injuries:

    a. Ashley was struck in the head, face and legs causing bumps and bruises.

    b. Ashley suffered the total permanent loss of one of her upper front teeth (tooth no. 8).

    c. Ashley suffered a fracture of the upper portion of her jaw called the buckle plate, which holds the front upper teeth in place.

    d. Ashley suffered a fracture to the adjacent upper front (tooth no. 9), losing about one third of the incisor portion of the tooth.

    e. At the time of the accident, Ashley had an orthodontic appliance in her mouth called a NANCE spacer in preparation for orthodontic work she needed before the accident. The NANCE spacer broke in the collision causing "moderate pain."

  f. Ashley suffered two lacerations on her chin requiring sutures and resulting in permanent scars.

  g. Ashley suffered a laceration through the left end of her lower lip resulting in a visible scar on the outside, and a lumpy scar on the inside of her lip.

  h. Ashley suffered a laceration under the right side of her lower lip requiring sutures and resulting in a permanent scar.

2. Ashley's treatment thus far has included:

  a. The repair and removal of the NANCE spacer.

  b. Removal of a fractured piece of bone in the buckle plate that sloughed off through the gum, about a week after the accident.

  c. Bonding and rebonding (twice) of her fractured tooth.

  d. Receiving a temporary plastic false tooth, called a flipper.

3. Ashley's future dental treatment will include:

  a. Surgical installation of a permanent dental implant for the lost tooth. This will require three surgical procedures over a period as long as 18 months.

  b. Following the surgical procedures, Ashley will require restorative dentistry to her adjacent teeth for aesthetic reasons.

Ashley's bumps and bruises, including a bump and a bruise on her forehead and bruises on her knee healed without incident and require no continuing medical care.

For approximately six weeks following the accident, before Ashley received the temporary artificial tooth, or "flipper," from Dr. Carpinito, Ashley rarely left the house, except to visit her best friend who lives next door. After receiving the flipper, Ashley still experiences

some embarrassment at having a false tooth. "Once in a while," Ashley has had trouble with the flipper falling out in public places such as at school, causing Ashley some further embarrassment. However, Ashley testified that most of her friends at school do not even know that she has a false tooth. Ashley occasionally has difficulty eating certain foods because of the flipper.

Ashley had a fear of dentists and dental work at the time of the accident which added to her suffering when undergoing the early dental work and examinations that became necessary as a result of the accident. However, Ashley's fear of dental work has significantly reduced over time, and she is not as afraid now.

Dr. DerKazarian testified that, once the tooth implant has been placed, which could be this year, it has a very good chance of successful prognosis and should last Ashley at least 25 years, and possibly for life. Both Dr. DerKazarian and Dr. Carpinito told Plaintiffs that Ashley should achieve an excellent result with her tooth implant and have a very good prognosis thereafter. Ashley testified that both of these dentists have told her that no one will be able to tell the difference between her natural teeth and her tooth implant, after she receives it.

Dr. Carpinito testified that it is possible that Ashley might eventually need to have root canals with post and crown for up to five teeth that were "loosened" in the accident. However, it is also possible that Ashley will never need the root canals. Dr. DerKazarian testified that in his opinion, Ashley should have no future problems with the "loose" teeth and there is an good chance that they will not require any future dental treatment. Further, none of the "loose" teeth not fractured in the incident have become symptomatic in the three years since the incident. The Court finds that the testimony in regard to the possibility of future root canals is speculative. The Court declines to award damages for dental work that might not be necessary.

Ashley's lacerations were sutured in the emergency room in Key West and the sutures were later removed by her general practitioner, Dr. Sabin Sullivan. Ashley experiences some embarrassment about her appearance because of her facial scars. However, the scars are barely noticeable from a few feet away. Further, Ashley is five foot four inches tall and the scar underneath her chin is generally not visible. The lumpy scar on the inside of Ashley's lip is not generally visible, but she occasionally bites it accidentally when chewing.

### IV.   Injuries sustained by Ronald Tassinari and related medical and dental care

4.   Ronald Tassinari suffered the following injuries in the accident:

   a.   A bloody nose.

   b.   A laceration through his right lower lip.

   c.   Temporary loosening of his anterior, upper and lower, teeth.

   d.   Temporary exacerbations of pre-existing knee, shoulder, and mid-back problems.

The bloody nose healed and caused no permanent or continuing problems. The laceration required sutures and left a permanent scar. However, Mr. Tassinari testified that the scars do not really bother him except for some occasional dribbling while he is drinking. The scars require no continuing treatment.

Mr. Tassinari's temporarily loosened teeth firmed up again within a few weeks. *See* Trial Transcript at 126. The teeth have not caused him any noticeable trouble other than some slight sensitivity to temperature. Dr. Carpinito testified that it is possible that Mr. Tassinari might eventually need to have root canals with post and crown for the teeth that were "loosened" in the accident. However, it is also significantly possible that Mr. Tassinari will never need the root canals. The Court finds that the testimony in regard to the possibility of future root canals is

speculative. The Court declines to award damages for dental work that might not be necessary.

Mr. Tassinari also received some additional chiropractic treatments for temporary exacerbations of pre-existing knee, shoulder, and mid-back problems. The effects of the exacerbations did not continue.

Three expert witnesses testified about Mr. Tassinari's alleged brain injury. Plaintiffs offered a neuropsychologist, Dr. John Gorvin. Defendant offered its own neuropsychologist, Dr. Dana Deboskey, and also a neurologist, Dr. Allan Herskowitz.

All of the experts testified at some length about the significance of retrograde (pre-incident) and anterograde (post-incident) amnesia in cases involving suspected brain damage. In that regard, Mr. Tassinari admitted that he remembers seeing Mr. Wilkerson's jet ski approaching him at a high rate of speed, and remembers grabbing Ashley with the thought of jumping into the water with her, to avoid the collision, and next remembers being in the water. Mr. Tassinari admitted that, if he lost consciousness, it was only for a few seconds. He also demonstrated an extremely good memory for the minutes following the accident, including getting back on his PWC; riding to shore with Ashley; picking his way between rocks on the shore (because he was barefoot); the fact that Ashley had a need to urinate when they reached shore; and offering to place the floor mats from the cab that took them to the hospital; onto the cab's seats, to avoid getting blood on the upholstery.

After returning to the Boston area, Mr. Tassinari went to see an ophthalmologist because his eyes had allegedly become extremely bloodshot several days after the incident,[2] and the

---

[2]Although photographs, taken three or four days after the incident and offered by Plaintiffs, show no bloodshot eyes at that point. It should also be noted that while Mr. Tassinari testified that the pupil of one of his eyes was more dilated shortly after the accident than it is currently, it is difficult to appreciate

ophthalmologist noted that one of his pupils appeared to be smaller than the other. Mr. Tassinari was also evaluated by a neurologist whose examination was normal, and he had several diagnostic studies, including an EEG, a CT scan and a brain MRI scan, all of which were negative. Those evaluations and tests took place within a few months of the incident.

Mr. Tassinari admits that none of those medical doctors told him that he had brain damage as a result of the collision. Neuropsychologist Dr. Gorvin acknowledged that neuropsychological tests are not intended as a substitute for neuroimaging technology such as CT scans or MRI scans, which he considers to be the gold standard for diagnosing a structural brain lesion.

Plaintiffs subsequently filed suit and, in August, 2006, more than two years after the accident, were deposed by counsel for Defendant. Mr. Tassinari testified that it was only at about that time that he realized he had a problem with his memory. Several months thereafter Mr. Tassinari was first evaluated by Dr. Gorvin. Dr. Gorvin testified that Mr. Tassinari was referred to him by Ms. Silva and his attorney. After evaluating and testing Mr. Tassinari, Dr. Gorvin told him that he had sustained brain damage; specifically, impaired executive functioning. Mr. Tassinari, who acknowledged that he did not realize that Dr. Gorvin is not a medical doctor, admitted that Dr. Gorvin is the only professional who has ever told him that he suffered brain damage as a result of the accident.

Dr. Deboskey explained to the Court that, in the context of a forensic neuropsychological evaluation, pre-incident data and materials such as educational and employment records are very

---

any significant difference in the size of his pupils in the photographs offered into evidence.

important when trying to evaluate a patient for a possible traumatic brain injury. Dr. Gorvin had none of Mr. Tassinari's educational or employment records, nor did he have the benefit of any of Mr. Tassinari's other medical records (including the record of his evaluation in the emergency room shortly after the incident) or the depositions of material witnesses including treating physicians and his supervisor at work.[3] Dr. Gorvin was told by Mr. Tassinari that he had two years of college education but the evidence at trial contradicted that assertion and revealed that Mr. Tassinari in fact was forced to leave college without even completing one year, because of his failing grades. Dr. Gorvin was under the impression that Mr. Tassinari's pre-accident job performance was acceptable but the evidence at trial indicated that, in the years before the incident, Mr. Tassinari's supervisors concluded on many occasions that he was performing at a level that was *not* acceptable, and Mr. Tassinari admitted in trial that he believes he was an underachiever.

Dr. Deboskey administered a full neuropsychological battery of tests and on the basis of those tests, her clinical evaluation of Mr. Tassinari and her review of all of the materials available to her, concluded that Mr. Tassinari does not show evidence of a traumatic brain injury as a result of the collision. Dr. Deboskey carefully evaluated all of the tests given both by Dr. Gorvin and by herself, to look for evidence of impaired executive functioning—the specific sequelae of alleged traumatic brain damage that Dr. Gorvin told Mr. Tassinari was his problem—and found that almost every test designed to look for problems with executive

---

[3]Dr. Deboskey had the benefit of reviewing all of those items and testified that she spent in excess of 60 hours evaluating Mr. Tassinari's case.

11

functioning, administered both by Dr. Gorvin and by herself, showed no such evidence.[4]

It is significant that Dr. Gorvin first began training in neuropsychology in 2001, and was only certified as a neuropsychologist in 2005, the year after the subject incident; furthermore, he has not yet applied to take the neuropsychological board examinations. Dr. Deboskey, on the other hand, has many years of experience in neuropsychology, is board certified, and is published in the field. Dr. Deboskey testified that she is very confident in opining that Ronald Tassinari does not demonstrate evidence of brain injury as a result of the PWC collision.

The only medical doctor to offer opinion testimony regarding the presence or absence of a brain injury was Defendant's neurologist, Dr. Allan Herskowitz. Dr. Herskowitz, who is board certified and the senior member of his multi-physician group, opined that Mr. Tassinari does *not* have brain damage. Interestingly, both Dr. Herskowitz and Dr. Deboskey testified that Mr. Tassinari's slightly enlarged pupil could well be a normal variant that has nothing to do with the incident; and Plaintiffs, who could have offered testimony from the neurologist and/or ophthalmologists who evaluated Mr. Tassinari within months of the incident, chose to give no such evidence.

Plaintiffs' apparently heavy reliance on Mr. Tassinari's supposed post-accident deterioration in his job performance is misplaced for several reasons. First, as noted above, there is evidence that Mr. Tassinari was critiqued by his supervisors for underperforming on multiple

---

[4]Dr. Gorvin alone administered nine different tests that looked for evidence of executive functioning problems. Mr. Tassinari scored at below average on one *part* of *one* of those nine tests. Dr. Deboskey testified: "Not only was Mr. Tassinari smart in intelligence; he was very intelligent in a number of other cognitive measures, particularly frontal lobe which is one of the things that we look at for effectiveness." She concluded that none of the testing that either she or Dr. Gorvin administered indicates that Mr. Tassinari has a frontal lobe brain injury.

occasions before the accident. Second, Mr. Tassinari himself admitted that the criticisms leveled at him by a supervisor with regard to certain aspects of his job since the incident, are the same criticisms that he faced before the collision occurred.[5] Third, Defendant demonstrated that the increasing criticism of Mr. Tassinari's job performance largely coincided with the arrival of his new supervisor, William McCarthy, and Mr. McCarthy testified that he is uninterested in how one of his employees performed prior to him becoming the supervisor; he is interested only in how that employee does while under his supervision.[6]

Mr. Tassinari's claim of brain damage from this incident is suspect for other reasons, also. Mrs. Silva and her daughters testified that the differences they've noticed are that, since the accident, Mr. Tassinari's eyesight has worsened (so that he now needs prescription eyeglasses) and he is forgetful, especially when it comes to following directions when driving.[7] However, Mr. Tassinari did not bring his eyeglasses with him when he traveled to south Florida to give his deposition in 2006; did not have his glasses with him when he took the witness stand and read a number of documents at trial; and admitted that he wears his glasses "infrequently." The evidence also suggests that his ophthalmologists may have been concerned about the

---

[5] Indeed, Mr. Tassinari acknowledged that, in order to get a "meets" grade on his evaluations, he has to achieve an accuracy rate for "abatements" of 90%. He received "below" grades on occasion before the accident when his accuracy rate was 80% or 82%; two years after the accident his accuracy level was 86%.

[6] "If you had problems before or if you were a great employee before, whatever, that's . . . you know, that's all well and good. But I kind of take it as, you know, what are you doing for me as an employee."

[7] Interestingly, Mrs. Silva opined that Mr. Tassinari's memory problems have become worse with time. Dr. Deboskey explained that that would not be consistent with a traumatic brain injury because the effects of acute brain injuries become *better* with time.

13

development of early cataracts and/or glaucoma, rather than a traumatic eye injury.

The effect (or lack thereof) of this accident on Mr. Tassinari's memory has been alluded to above, because, as noted, Mr. Tassinari seems to have an extremely clear recollection of the minutes immediately following this incident. Dr. Deboskey testified that, based upon the neuropsychological tests that were performed, Mr. Tassinari does not demonstrate the type of memory difficulties that are the hallmark of a traumatic brain injury, but may have some memory problems as a result of depression; and the record is replete with evidence that Mr. Tassinari suffered from depression for many years before this incident.[8] It is also of note that, while Mr. Tassinari's girlfriend and her children claim that he has difficulty following directions when driving, he admitted being able to navigate a new vessel from Connecticut to the Boston area; and was able to describe without difficulty at trial the route that he took.

Therefore, the Court finds that Mr. Tassinari did not received a traumatic brain injury as a result of the accident and should not be awarded damages for brain injury, lost raises, suspensions, or for speculative loss of future earnings or earning capacity.

## CONCLUSIONS

This Court has personal jurisdiction over the parties and subject matter jurisdiction over this controversy as a result of a collision between two personal water craft occurring on navigable waters within the territorial waters of the State of Florida pursuant to 28 U.S.C. § 1333.

The Tour guide Betz had not "successfully completed a boater safety course approved by

---

[8] On direct examination Mr. Tassinari denied ever having taken antianxiety medication before the accident; on cross-examination, however, he admitted that in addition to anti-depressants, he was prescribed Xanax to help him deal with the loss of his girlfriend of many years, several years before the incident; also, that he was still seeing a psychiatrist (Dr. John Stevens) and a psychotherapist (Dr. O'Halloran) when the incident happened.

the National Association of State Boating Law Administrators and this state" as required by Fla. Stat. §327.54. Therefore, Betz was not qualified to give proper instruction in safe-handling of personal watercraft, and Defendant Key West Water Tours was negligent in allowing Betz to give that instruction and negligent in allowing the members of the tour that day to control the watercraft without proper instruction.

However, the Court finds that Wilkerson, without proper training and experience, was also negligent in operating the watercraft at a high rate of speed in the vicinity of other persons on other watercraft. The Court finds that Defendant Key West Water Tours' pro rata share of liability is 90% and Third-Party Defendant Jeffrey Wilkerson's pro rata share of liability is 10%. The Court finds that Defendant Key West Water Tours is entitled to contribution of 10% from Third-Party Defendant Jeffrey Wilkerson under Fla. Stat. 768.31.

### Damages of Ashley Silva

The Court concludes that the injuries sustained by Ashley Silva as described in part 1(a–h) of the section III above were caused by the accident in question and the negligence discussed above. The Court further finds that the medical/dental treatment described in parts 2(a-d) and 3(a-b) of section III are necessary, reasonable and related to the accident in question. Finally, the Court finds that Ashley Silva suffered mental pain and suffering in part as the result of her dental phobia and the specific nature of her injuries. The Court therefore awards damages to Ashley Silva as follows:

1. Stipulated total past and future medical/dental bills     $10,566.58
2. Past physical pain & suffering, including disfigurement, mental anguish, disability & impairment     $15,000.00

    3. Future physical pain & suffering, including disfigurement,

        mental anguish, disability & impairment         $10,000.00

Total damages of Ashley Silva:         $35,566.58

### Damages of Ronald Tassinari

The Court finds that the injuries of Ronald Tassinari as described in paragraph 4(a–d) of section IV above were caused by the accident in question and the negligence discussed above. The Court further specifically finds that Ronald Tassinari has not suffered a brain injury affecting his memory, cognitive function and executive skills. The Court therefore awards damages to Ronald Tassinari as follows:

    1. Stipulated total medical/dental bills         $8,929.00

    2. Sick pay lost following the accident         $1,074.60

    3. Past physical pain & suffering, including disfigurement,

        mental anguish, disability & impairment         $5,000.00

    4. Future physical pain & suffering, including disfigurement,

        mental anguish, disability & impairment         $2,500.00

Total damages of Ronald Tassinari         $17,503.60

Therefore, it is

ORDERED AND ADJUDGED that Plaintiff Ashley Silva shall recover from Defendant Key West Water Tours, L.C. the sum of $35,566.58 together with prejudgment interest from the date of accident in accordance with the general rule of admiralty. Defendant Key West Water Tours, L.C. may recover contribution of 10% of that amount from Third-Party Defendant Jeffrey Wilkerson. It is further

ORDERED AND ADJUDGED that Plaintiff Ronald Tassinari shall recover from Defendant, Key West Water Tours, L.C. the sum of $17,503.60 together with prejudgment interest from the date of accident in accordance with the general rule of admiralty. Defendant Key West Water Tours, L.C. may recover contribution of 10% of that amount from Third-Party Defendant Jeffrey Wilkerson. The Court retains jurisdiction over issues regarding attorneys' fees and costs. The Clerk of Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 31st day of October, 2007.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All counsel of record